750 F.2d 250
 Luvinia ALEXANDER, for herself and as guardian ad litem for
Sharifa Alexander; Sylvia Bey, for herself and as guardian
ad litem for Trustin Bey; Irene Burkett, for herself and as
guardian ad litem for Robert Burkett; Andrea Carey, for
herself and as guardian ad litem for Leslie Bonita Rex;
Sheila Mitchell, for herself and as guardian ad litem for
Tamika Mitchell; and Elizabeth Truitt, for herself and as
guardian ad litem for Leon Truitt, Appellants in No. 83-1811,
v.
Louis POLK, M.D., Acting Director of the Philadelphia
Department of Health, individually and in his official
capacity; Pearl Pitt, M.D., WIC Coordinator, Division of
Maternal and Child Health, Philadelphia Department of
Health, individually and in her official capacity; David
Soricelli, D.D.S., Director of Community Health Services,
individually and in his official capacity; Christine
Kniszley, M.D., Director of Maternal and Child Health
Programs, individually and in her official capacity; Barry
Dickman, Administrator of the WIC Program, individually and
in her official capacity; Jack Burkhardt, Administrator of
the Division of Maternal and Child Health of the
Philadelphia Department of Health, individually and in his
official capacity; the Department of Health of the City of
Philadelphia; Leonard Bachman, M.D., Secretary of Health of
the Commonwealth of Pennsylvania, individually and in his
official capacity; Mary Ann Britton, R.D., State WIC
Coordinator, individually and in her official capacity; the
Department of Health of the Commonwealth of Pennsylvania,
Appellants in No. 83-1832.
 Nos. 83-1811, 83-1832.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 10, 1984.
Decided Dec. 17, 1984.
 
 Richard Weishaupt (argued), Niles Schore, Community Legal Services, Inc., Philadelphia, Pa., for appellants in No. 83-1811 and appellees in No. 83-1832.
 Pamela L. Perry, Deputy City Sol., Philadelphia, Pa., for City appellants/appellees.
 David H. Ward, Ruth E. Granfors, Asst. Counsels, Ruth M. Siegel, Chief Counsel (argued), Harrisburg, Pa., for Commonwealth appellants/appellees.
 Ralph J. Teti, Philadelphia, Pa. (argued), for appellee in No. 83-1811 and appellants in No. 83-1832.
 Before SEITZ, GIBBONS and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge:
 
 
 1
 This class action challenges the administration of the Supplemental Food Program for Women, Infants, and Children (WIC), 42 U.S.C.A. Sec. 1786 (West 1978),[1] by the City of Philadelphia in 1977 and 1978. The plaintiffs are a class of four-year-old children terminated from the WIC program without notice of the opportunity for a hearing, and a single individual, Andrea Carey, terminated by reason of her alleged use of abusive language to a grocery store clerk. The defendants are the City of Philadelphia, a number of its officials named in their individual and official capacities, and the Commonwealth of Pennsylvania. The original complaint, filed in August of 1978, sought injunctive relief and damages against the City and its officials arising from the City's termination of benefits for four-year-old children eligible for the WIC program. In October of 1978 the district court denied plaintiffs' motion for preliminary injunctive relief. Alexander v. Polk, 459 F.Supp. 883 (E.D.Pa.1978). Thereafter plaintiffs filed an amended complaint adding the Commonwealth as a defendant and seeking the publication of certain "fair-hearing" regulations. The Commonwealth published these regulations in September of 1980. 10 Pa.Bull. 3586 (Sept. 6, 1980). Plaintiffs concede that this publication rendered any claim for relief against the Commonwealth moot. Br. at 2. The City discontinued the policy of terminating children from the WIC program in November of 1978, thereby rendering any claim for injunctive relief against the City moot. Thus only the plaintiffs' claim for damages against the City survives.[2]
 
 
 2
 In September of 1983 the district court held in favor of the plaintiffs on liability, concluding that the City violated the 1978 WIC regulations and due process by failing to provide notice of the right to a "fair hearing." Alexander v. Polk, 572 F.Supp. 605 (E.D.Pa.1983). The court reasoned, however, that only one class member, four-year-old Leon Truitt, would have prevailed at such a hearing. Accordingly, it ordered compensatory damages of $87.75 on behalf of Truitt, and nominal damages on behalf of Andrea Carey and the plaintiff class. Id. at 623. In the appeal at No. 83-1811, Carey and the class appeal from the award of nominal damages. In the appeal at No. 83-1832, the City of Philadelphia appeals from the damage award in favor of Leon Truitt and the judgment of liability in favor of the class. In No. 83-1811 we reverse and remand for further proceedings on behalf of the class but not Carey. In No. 83-1832 we affirm.
 
 I. The WIC Program
 
 3
 As enacted in 1972, the WIC program provided cash grants to participating states for the purpose of making "supplemental foods" available to children and pregnant or lactating women faced with the risk of malnutrition because of inadequate income.[3] Regulations promulgated by the Department of Agriculture required that health departments of participating states administer funds through local agencies, 7 C.F.R. Secs. 246.4, 246.6 (1978), and "enter into a signed written agreement with each local agency setting forth the local agency's responsibilities under the Program as prescribed in this part," 7 C.F.R. Sec. 246.6(a) (1978). Between 1974 and February of 1979, the Commonwealth Department of Health administered the WIC Program in Pennsylvania. The local agency responsible for operating the Program in Philadelphia was the Philadelphia Department of Public Health.
 
 
 4
 The WIC regulations vested general administrative responsibility for the Program in the state agencies.[4] In particular, the states were charged with maintaining a "financial management system which provides accurate, current and complete disclosure of the financial status of the Program ...." 7 C.F.R. Sec. 246.11(a) (1978). All "[p]rogram funds control, including, but not limited to, comparisons of actual Program expenditures with budgeted amounts," was the obligation of the states. 7 C.F.R. Sec. 246.11(e) (1978). Responsibility for maintaining records identifying "the source and application of funds expended for Program activities" was also that of the states. 7 C.F.R. Sec. 246.11(c) (1978).
 
 
 5
 Individual placement decisions, in contrast, were to be made by a "competent professional authority on the staff of the local agency." 7 C.F.R. Sec. 246.7(b)(2)(ii) (1978). The eligibility of each program recipient was to be established by local agencies at an initial "certification visit" and reestablished at six-month intervals. 7 C.F.R. Sec. 246.7(d) (1978). During these visits, local agency staff members were to ensure "that those persons in greatest nutritional need are placed in the Program first." 7 C.F.R. Sec. 246.7(b)(2)(ii) (1978). In the event that the Program reached its maximum participation level, local agencies were to apply a system of priorities.[5] A recipient could be removed from the Program at a "certification visit if that person, in the competent professional's judgment, [was] no longer believed to be in nutritional need, or if there [were] potential recipients waiting who, according to the priority system, [were] in greater nutritional need." 7 C.F.R. Sec. 246.7(c) (1978).
 
 
 6
 Recipients removed from the program were entitled to a hearing at which the grounds for removal could be challenged. Section 246.24 directed state agencies to establish a hearing procedure for this purpose,[6] and to inform recipients of the right to a hearing during the initial certification visit and in writing at the time of any determination of "ineligibility" for benefits. 7 C.F.R. Sec. 246.24(a) (1978). During the pendency of any such hearings, recipients participating in the Program were to "continue to receive Program benefits until a decision is reached in the fair hearing proceedings." 7 C.F.R. Sec. 246.24(b) (1978).
 
 
 7
 In its day-to-day operation, the Program functioned as follows:
 
 
 8
 A potential WIC recipient undergoes a health assessment by a competent professional authority, who evaluates the applicant's nutritional status and makes the determination of eligibility. The certified WIC recipient then receives a prescription for the appropriate food package. The prescription is in the form of a voucher, to which is attached a check drawn on the Commonwealth's account. The recipient designates, from the list of vendors who have agreed with the City to supply the required foods at a specific price, the grocery store at which she will exchange the voucher for the food prescribed. The recipient has thirty days from issuance to cash in the voucher, and the vendor then has sixty days from the expiration date of the voucher to present the check for payment. The checks paid in a given month are reported through the state's data processing system to the Department, which relays that information to the local agency.
 
 
 9
 459 F.Supp. at 887-88 (footnotes and citations omitted).
 
 II. The City's Operation of the Program
 
 10
 On October 1, 1977, the Commonwealth entered into a written agreement with the Philadelphia Department of Health. App. at 249-62. This agreement provided as a "guideline" a monthly caseload allocation of 15,000 cases, subject to increase if additional Program funds were available.[7] Monthly food expenditures were limited to $300,000.[8] Thus the contract anticipated an average voucher cost of $20.00 per month. The agreement further provided that the City would "ensure that project staff and program participants are informed of the rights of participants and applicants and of procedures for Fair Hearings approved by the State Health Department." App. at 250.
 
 
 11
 In November of 1977 the City conducted a tally of all persons who had been issued food vouchers during the prior three or six months.[9] Some 19,600 persons--more than 4000 above the recommended monthly caseload--proved to have been issued one or more vouchers during this period. The City made no adjustment in this figure, however, for recipients who had become ineligible during the period by reason of changes in age, domicile, or medical condition; for those who only sporadically procured vouchers; or for vouchers never redeemed. 572 F.Supp. at 611. On the basis of this head count, the city initiated a priority system in conformance with section 246.7(b)(2)(ii). Dr. Pearl Pitt, Philadelphia WIC Coordinator, directed local health officials to stop certifying new non-lactating postpartum women--those women comprising Priority VI--and four-year-old children with no medical problems--a subset of Priority V. In addition, Dr. Pitt instructed local officials to remove from the Program recipients then in these categories. The Coordinator adopted a "four-year-old cutoff" because she believed it unnecessary to remove all Priority V recipients from the Program and because the risk of anemia to young children decreases after age three. 572 F.Supp. at 611.
 
 
 12
 Recipients designated for termination were informed orally (but not in writing) of their removal from the program during their last certification visit. Although recipients had been informed of the right to a hearing during their initial certification visit, the City concedes that they were not so informed at the time of their terminations, either orally or in writing. Pennsylvania, in turn, concedes that at all relevant times it had not published the procedures for WIC hearings required by section 246.24 of the regulations. Id. Nevertheless, the Commonwealth asserted before the district court and continues to assert on appeal that "fair hearings would have been offered had hearings been requested." Id. at 613 & n. 14; Br. at 14. Characterizing this explanation as a "post hoc rationalization," the district court concluded that it "cannot accept this post hoc rationalization as fact." Id. at 613.
 
 
 13
 After initiating its priority system, the City did not determine how many recipients had been removed from each priority class, did not maintain a continuous count of Program participants, and did not reevaluate Program participation until September of 1978. Id. at 612. At that time the City established a level of Program participation of roughly 15,800 persons. At no time, however, did the City actually establish that Program expenditures exceeded the monthly allocation of $300,000.
 
 
 14
 In fact, Philadelphia's actual WIC expenditures were below levels permitted by the City's contract. The City has estimated the average June, 1978 voucher cost as between $17.25 and $17.85; at these rates, the City's expenditures at the time of the June head count would have been between $272,394 and $281,869, or roughly $20 to $30 thousand below authorized levels. Id. at 612 n. 10. Computer records compiled by the Commonwealth after June of 1978 reveal that the actual value of vouchers redeemed during the October 1, 1977 to June 30, 1978 contract period was $2,228,335--$471,665 less than the total $2.7 million contract value. Id. at 612. Like the City, the Commonwealth also spent less than its total WIC allotment in 1977 and 1978. It is undisputed that the Commonwealth returned over $1.6 million in unspent WIC funds to the federal government for the 1978 fiscal year. App. at 373-74.[10]
 
 
 15
 The Commonwealth, aware that the City was disbursing less than its allotted funds, objected to the City's implementation of a priority scheme. In a letter dated April 10, 1978, the Commonwealth WIC Coordinator instructed:
 
 
 16
 [T]he State WIC Agency will instruct local agencies when to begin implementation of the priority system for new enrollees. Since the State Agency accepts this responsibility, the State Agency also accepts responsibility for managing food expenditures on a statewide basis. No local WIC agency will be held responsible for food costs expended beyond their allocated amount unless that local agency fails to follow State Agency instructions to implement the priority system.
 
 
 17
 ... I trust that you will discontinue using any such [priority] system until it becomes necessary and the official instructions are given.
 
 
 18
 App. at 193. Similarly, on August 4, 1978, the Director of the Commonwealth's Bureau of Special Services informed Dr. Pitt "that the Philadelphia WIC Program has not spent its total monthly allocation to date and that [it] had authorization to do so by the State WIC Coordinator in a letter dated April 10, 1978." App. at 317. Acting contrary to these instructions, the City continued to apply the priority system until November 27, 1978. In February of 1979 the City ceased to administer the WIC Program.
 
 
 19
 The City's refusal to abide by the Commonwealth's instructions stemmed from the concededly poor quality of administrative records maintained by the Commonwealth. The district court found that "there was a time delay of two to six months between issuance of vouchers in any month and a local agency's receipt of its expenditure report for that month" from the Commonwealth.[11] 572 F.Supp. at 610. Consequently, the court found, the Commonwealth "failed to provide an adequate accounting system ...." Id. at 612. The court also concluded that the City maintained inadequate administrative records. "City officials chose a questionable methodology for their head count," the court found, "and failed to monitor program participation until nine months later." Id.
 
 
 20
 The City's distrust of the Commonwealth's statistics led the City to press for indemnification for any contract cost overruns. Although the Commonwealth's April 10, 1978 letter asserted that "[n]o local WIC agency will be held responsible for food costs expended beyond their allocated amount unless that local agency fails to follow State Agency instructions," the Commonwealth did not agree to a contract modification to this effect. In the absence of such a modification, the City declined to alter its priority scheme. This litigation followed.
 
 III. The District Court's Opinion
 A. Existence of a violation
 1. Violation of the regulations
 
 21
 The district court concluded that the City did not violate WIC regulations by implementing a priority system in contravention of Commonwealth instructions. "The City's manner of allocating its allotted moneys," the court held, "neither contravened the regulations nor frustrated their underlying policy." 459 F.Supp. at 897 (on motion for preliminary injunction). Gauging the City's actions "not with the benefit of hindsight but with the information that was available to the parties at the time the decision was made," 572 F.Supp. at 612, the court reasoned that the City reasonably concluded that "the Commonwealth's accounting reports could not be relied upon." Id. In the court's view, "[t]he City was, therefore, forced to strike a balance between currently providing services to all eligible recipients on one hand and protecting its fiscal integrity" on the other. Id. The priority system chosen to effectuate this balance, the district court held, was consistent with the regulations.
 
 
 22
 Nevertheless, the court concluded, the City violated 7 C.F.R. Sec. 246.24 (1978) by providing oral rather than written notification to recipients removed from the program, and by failing to notify these recipients of their right to a fair hearing. The court rejected the City's argument that oral notification of removal was a satisfactory substitute for written notice, observing that "the regulations require that the notice be written." 572 F.Supp. at 613. It also dismissed the City's position that notice of the right to a fair hearing would have been futile because the Commonwealth had failed to promulgate hearing procedures, reasoning that the "City defendants were obligated to follow the dictates of the regulations whether or not those regulations were wise in this specific situation." Id. Finally, the court rejected a proffered distinction between cases of "ineligibility" and "removal." The City had argued that the plaintiffs had simply been "removed" from the WIC program but remained "eligible" for it; the WIC regulations, the City maintained, required notice only in cases of "ineligibility," not "removal." The court observed that section 246.24 requires notice in cases of "suspension" as well as termination, and that "removal" was the equivalent of "suspension." Id. at 614.
 
 2. Due process violation
 
 23
 As an alternative ground of decision, the district court held that plaintiffs had a property interest in WIC benefits that had been terminated without due process. Eligibility for WIC benefits constituted a property interest despite the Program's limited enrollment, the court reasoned, because the enrollment limitation simply amounted to a condition on the right to receive benefits, dependent on the availability of funding, but did not deprive WIC eligibility of its character as a property right. 572 F.Supp. at 615-16. The court rejected the City's position that the determination of nutritional need was a "subjective" decision incapable of review in fair hearings. "[A] review of such decisions would have allowed for identification of errors," the court found; moreover, when the City implemented the priority program, it did not employ individualized medical evaluations. Id. at 616. In addition, the court rejected the City's argument that the propriety of any priority system "was a policy decision which could have been challenged only in the courts," not in fair hearings. Id. at 617. Whether "the factual predicate for the institution of priorities had been met," the district court concluded, was "a determination appropriate for review" in fair hearings. Id. Finally, the court was unpersuaded by the City's defense that WIC regulations obliged the Commonwealth, and not the City, to afford fair hearings, and that any failure to provide hearings was therefore the fault of the Commonwealth, reasoning that both the City and the Commonwealth were under a due process obligation to provide hearings, even if WIC regulations charged the Commonwealth alone with that obligation. Id. Alternatively, the City was also under a due process obligation to provide notice of the right to a hearing, an obligation on which the City also defaulted.[12] Id. at 618.
 
 B. Remedy
 
 24
 Having concluded that both the WIC rules and the due process clause required that the City give notice of the right to a fair hearing, the court addressed the City's liability for damages. Leon Truitt, the district court found, had been removed incorrectly from the Program and would have been reinstated after a hearing. The court assessed damages in favor of Truitt at $87.75. 572 F.Supp. at 620 & n. 25. The court reasoned, however, that the remaining class members would not have prevailed at a hearing.
 
 
 25
 Despite its earlier skepticism, the district court here adopted the parties' position that hearings would have been provided by the Commonwealth if requested. In addition, the court assumed "for the sake of argument" that "the Commonwealth would have decided that the City was wrong in instituting the priority program." Id. at 619. Nevertheless, the court reasoned, the class members would not have prevailed at Commonwealth hearings:
 
 
 26
 Such a hearing would, in all probability have produced nothing more than has existed throughout the entire course of this litigation--a conflict between the City and the Commonwealth about the appropriateness of implementing the priority program. Thus, while plaintiffs may have been said to have prevailed at the administrative hearing, it is unlikely that the City would have reinstated them without a guarantee by the Commonwealth to reimburse the City for all cost overruns associated with abandoning the priority program. This is the guarantee the City continually sought and the Commonwealth continually refused to provide.
 
 
 27
 Id.
 
 
 28
 Unlike other members of the plaintiff class, Andrea Carey had received all vouchers to which she was entitled. Carey sued instead for injury caused by emotional distress. The court declined to award damages to Carey, reasoning that while she "experienced justifiable displeasure with the City's actions, I do not find that her distress rose to a compensable level." Id. at 620 (footnote omitted). In a footnote, the court compared any humiliation experienced by Carey to emotional distress occasioned by racial or sexual discrimination, for which other courts had awarded damages between $250 and $750. The court found no proof of injury rising to the level of that found in those cases. Id. at 620 n. 26.
 
 
 29
 Finally, the court held that money damages against the City is an appropriate remedy, noting that benefits in kind could no longer be awarded,[13] that an award of damages could not run against the federal government (a non-party), and that in all likelihood, the plaintiffs had "used their own money which would otherwise have been allocated for other purposes to fill the nutritional void" caused by their loss of benefits. Id. at 622.
 
 IV. Our Decision
 A. Issues pertaining to the violation
 1. Violation of the regulations
 
 30
 In Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Court held that violations of federal statutes under color of state law may be actionable under section 1983. Id. at 4-8, 100 S.Ct. at 2504-2506. Any such violation causing injury states a claim under the 1871 Civil Rights Act unless Congress itself has foreclosed enforcement of such federal statute under section 1983, or the federal statute itself does not create enforceable "rights." See Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981); Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, 453 U.S. 1, 19, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981).
 
 
 31
 It is clear that 7 C.F.R. Sec. 246.24 (1978) created an enforceable right on behalf of WIC recipients to be informed of the availability of fair hearings. The regulatory language was cast in the imperative and spoke of the "right to a fair hearing":
 
 
 32
 Whenever a person is determined to be ineligible to participate in the Program, the person shall be notified in writing of the reason for his ineligibility and his right to a fair hearing.
 
 
 33
 The provision was intended to safeguard the legal rights of WIC beneficiaries by informing them of fair hearing procedures. Without such notice, the elaborate hearing mechanism of section 246.24(b) would have been a hollow gesture. It is equally clear that Congress did not foreclose the enforcement of section 246.24 under the Civil Rights Act. The allegation that notice of the right to fair hearings was not given could not, of course, have been litigated in fair hearings. Nor do the parties point to any other judicial or administrative forum in which this claim could have been raised. Consequently, the section 246.24 claim is properly before us as a section 1983 claim.
 
 
 34
 The plaintiffs allege two violations of section 246.24: their notice of termination was oral rather than written; and notification did not include notice of the right to a fair hearing. The City, in response, maintains here as in the trial court that section 246.24 required no notice of any kind because the plaintiffs were "removed" from the WIC Program, not rendered "ineligible" for it. In any event, the City argues, the combination of the City's initial written notice of the right to a fair hearing and oral notice of termination constituted substantial compliance with section 246.24.
 
 
 35
 The WIC regulations undermine the City's proffered distinction between "removal" and "ineligibility." Section 246.24 provides in pertinent part:
 
 
 36
 (a) Each potential recipient shall be informed of the right to a fair hearing during the initial Program certification. Whenever a person is determined to be ineligible to participate in the Program, the person shall be notified in writing of the reason for his ineligibility and his right to a fair hearing.
 
 
 37
 (b) Each State agency participating in the Program shall establish a hearing procedure under which a person ... can appeal from a decision made by a local agency denying such person participation in the Program or suspending such person's participation....
 
 
 38
 7 C.F.R. Sec. 246.24 (1978) (emphasis added). Subparagraph (b) indicates that both "denials" and "suspensions" of eligibility could have been challenged in fair hearings. Thus, the word "ineligibility" in subparagraph (a) must be construed as encompassing both denial and suspension of participation. The word "removal," as it is intended by the City, is in every way the equivalent of "suspension." Consequently, whether the City now characterizes its action as a "removal" or a determination of "ineligibility," section 246.24(a) required that the City give Program recipients notice of their impending termination and of the right to a fair hearing.[14]
 
 
 39
 The City also maintains that oral notice of termination substantially complied with the obligation to provide written notice, and that the initial notice of the right to a fair hearing substantially complied with the obligation to repeat that notice upon termination. Whatever may be the merits of the first proposition, the second position is clearly flawed. There is no reason to believe that an initial notice of the right to a hearing substitutes adequately for notice at the time of termination. Philadelphia began administering the WIC Program in 1974. Many Program participants therefore received notice of the right to fair hearings three to four years before their termination. Memories flag over such long periods of time. This was, in any event, the judgment of the Department of Agriculture, which expressly required reiteration of the notice in writing at the time of termination. As the agency charged with administering the WIC program, the Department's judgment is entitled to deference. In short, notice years before the cancellation of a recipient's benefits is not a substitute for notice at the time of termination when it is most necessary.
 
 
 40
 Consequently, we hold that the district court concluded correctly that the City violated section 246.24(a) and that this violation was actionable under section 1983.
 
 
 41
 Philadelphia would have us disregard its violation of section 246.24(a) as damnum absque injuria, on the theory that WIC eligibility is not a property interest and the denial of WIC benefits is not a compensable injury. Transfer payments are generally considered to be "property" under federal law. Goldberg v. Kelly, 397 U.S. 254, 261-63, 90 S.Ct. 1011, 1016-18, 25 L.Ed.2d 287 (1970) (AFDC benefits property under federal law). The City presses two grounds in support of the position that WIC eligibility is not such a property interest in this case: (1) the WIC Program was not "open-ended"--that is, the program had limited funds--and therefore did not guarantee that all eligible persons would receive benefits; and (2) the determination of nutritional need was allegedly "subjective" and without a basis in "specific objective eligibility criteria."
 
 
 42
 The limited funding earmarked for the WIC Program does not compel the conclusion that WIC eligibility is not a property interest. An "interest in a benefit is a 'property' interest if there are such rules or mutually explicit understandings that support [the beneficiary's] claim of entitlement to the benefit [which] he may invoke at a hearing." Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). The WIC statutory and regulatory provisions establish such rules. Section 1786(b)(1) provided that the Secretary "shall make cash grants" up to the funding limits allotted in the statute. 42 U.S.C.A. Sec. 1786(b)(1) (West 1978). Thus, the Secretary did not have discretion to withhold appropriated funds. Appropriated funds were to be distributed according to a well-defined priority system, the criteria for which were quite specific. The priority level at issue here, for example, included "[c]hildren in nutritional need because of an inadequate dietary pattern, as documented by a person qualified in such assessments." 7 C.F.R. Sec. 246.7(b)(2)(ii)(E) (1978). "Children" was defined as "persons who are at least one year of age but have not reached their fifth birthday." 7 C.F.R. Sec. 246.2 (1978). Nutritional need was to have been documented, inter alia, by measurements of height, weight, or length, and by "hemoglobin or hematocrit tests." 7 C.F.R. Sec. 246.7(b)(2)(ii) (1978). The regulations afforded competent medical professionals no discretion to deny benefits to persons whose eligibility was established; rather, these professionals were to certify potential recipients on the basis of the priorities defined in section 246.7.
 
 
 43
 Thus, any potential recipient could establish the right to benefits according to specific criteria. These criteria gave rise to more than a "unilateral hope" for benefits. Compare, e.g., Board of Pardons v. Dumschat, 452 U.S. 458, 465, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981). Potential recipients had a legitimate expectation of receiving benefits upon satisfying the criteria specified in section 246.7. For this reason, they had a legally cognizable property interest. The existence of adequate funding simply imposed an additional condition on the receipt of benefits.
 
 
 44
 We also reject the City's position that the determination of "nutritional need" was wholly "subjective," and therefore unreviewable. This position is undermined both by section 246.7 itself, which announced specific criteria for the determination of nutritional need, and by section 246.24, which provided for fair hearings to review such determinations. In requiring that measurements of height and weight be made and that hemoglobin or hematocrit tests be performed, the federal agency obviously intended that determinations of nutritional need be made on the basis of objective criteria. In further providing for administrative review of benefit determinations, that agency anticipated that these determinations would be reviewable under objective standards.
 
 
 45
 The district court correctly held, therefore, that WIC recipients had a property interest in eligibility for WIC that formed the basis of a legally cognizable claim in a section 1983 action charging a violation of section 246.24(a).
 
 2. Violation of the Due Process Clause
 
 46
 The district court also held that eligibility for WIC benefits is a property interest protected under the due process clause, and that the failure to give notice of the opportunity for fair hearings or to hold hearings violated due process. The City advances several arguments in opposition to these conclusions. We need not address those arguments. We have held in Part IV A 1 above that the City violated section 246.24(a), and that this violation was actionable under section 1983. That holding assumes that WIC benefits are a form of property interest created by federal law and section 246.24(a) specifies the notice which should have been given prior to their termination. Because these statutory grounds are dispositive, there is no need to determine whether the due process clause of the fourteenth amendment requires the same outcome. Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); Siler v. Louisville & Nashville R. R., 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909).
 
 B. Issues Pertaining to the Remedy
 
 47
 Finally, we must determine whether the district court correctly awarded nominal damages to the class and to Andrea Carey, and whether the court properly awarded the cash equivalent of WIC benefits to Leon Truitt.
 
 1. Nominal damages to the class
 
 48
 The district court assumed "for the sake of argument" that "the Commonwealth would have decided that the City was wrong in instituting the priority program." 572 F.Supp. at 619. The court also apparently assumed that the Commonwealth, and not the City, would indeed have provided such hearings if they were requested, id., despite the court's earlier characterization of the Commonwealth's promise to do so as a "post hoc rationalization," id. at 613. Proceeding from these assumptions, the court nevertheless reasoned that
 
 
 49
 the Commonwealth was either powerless to enforce, or unconcerned with enforcing, compliance. There is no convincing reason to believe the City would have acted differently after a Commonwealth administrative hearing. Such a hearing would, in all probability have produced nothing more than has existed throughout the entire course of this litigation--a conflict between the City and the Commonwealth about the appropriateness of implementing the priority program.
 
 
 50
 572 F.Supp. at 619. Consequently, the court concluded, the plaintiffs (with the exception of Leon Truitt) would not have prevailed had fair hearings actually been held.
 
 
 51
 The class plaintiffs challenge this conclusion on two grounds. First, they maintain, it is the product of an application of an improper legal standard. The trial court, plaintiffs aver, wrongly imposed a burden of proof on WIC recipients to show they would have prevailed rather than on the Commonwealth to show that they would not have prevailed. Second, plaintiffs charge, the court erred as a matter of law in inquiring into whether the City would in practice have obeyed any hearing decisions.
 
 
 52
 The second of these arguments is unquestionably correct. Section 246.24(b) provides:
 
 
 53
 Each State agency participating in the Program shall establish a hearing procedure under which a person, or the person's parent or guardian, can appeal from a decision made by a local agency denying such person participation in the Program or suspending such person's participation.
 
 
 54
 7 C.F.R. Sec. 246.24(b) (1978). This section implicitly contemplates that the local agencies shall be bound by state agency reversals of local benefit denials. Any other interpretation would render the judgments of state fair hearings unenforceable. Indeed, the purpose of requiring state officials to review local decisions could only have been to provide independent review of local agency findings. The regulations must have contemplated that this independent review be effectual. In addition, the regulations expressly bound local agencies to comply with "State agency ... guidelines and instructions." 7 C.F.R. Sec. 246.3(d) (1978). If fair-hearing determinations are not literally such "instructions," this section evinces at the least the intent that state agencies be ultimately responsible for the Program's administration. Thus, if the plaintiffs would have prevailed at any hearings conducted by the Commonwealth, then they will also have established their right to actual damages.
 
 
 55
 The district court did not, however, determine whether the plaintiffs would in fact have prevailed at any hearings held by the Commonwealth. Indeed, the court did not find as a fact that the Commonwealth would have held any such hearings at all, and at one point suggested the contrary. Rather, the court assumed these facts arguendo, concluding simply that the stalemate between the City and the Commonwealth would nevertheless have continued unabated. Because the court's reliance on the latter conclusion was an error of law, a remand is necessary for findings on whether, as the Commonwealth has always maintained, it would have held the required hearings, and if so, whether the plaintiffs would have prevailed at such hearings.
 
 
 56
 The City urges that we conclude as a matter of law that, with the exception of Leon Truitt, the plaintiffs would not have prevailed at any hearings, reasoning that the issue of the propriety of implementing a priority system would not have been subject to adjudication in fair hearings. It is the City's view that the propriety of any priority system is a "systemic or legal issue[ ]" whose adjudication the Child Nutrition Act did not contemplate occurring in fair hearings. Br. at 21. The plaintiffs' only ground for prevailing at fair hearings, in turn, would have been that Commonwealth hearing officers would have disapproved of the City's priority scheme, and therefore would have reinstated all persons terminated for that reason. Because the plaintiffs' only ground for prevailing could not have been litigated in fair hearings, the City concludes, as a matter of law, the plaintiffs could not have prevailed at such hearings. The plaintiffs maintain, on the other hand, and the district court concluded, that the propriety of any priority system could have been litigated in fair hearings. 572 F.Supp. at 617.
 
 
 57
 The WIC regulations appear to permit the adjudication of the propriety of any priority system in fair hearings. For example, the regulations permit the review of any local agency decision denying an individual's participation "or suspending such person's participation." 7 C.F.R. Sec. 246.24(b) (1978) (emphasis added). One obvious ground for suspension of participation would have been that limited funds required the imposition by local authorities of the priority system provided in section 246.7. In such event, the only issue for adjudication at a Commonwealth hearing would have been the propriety of the local agency's decision to implement a priority system.
 
 
 58
 State review of the imposition of local priority systems is also consistent with the fiscal management of the WIC program as provided in the regulations. Section 246.11 vested the responsibility for all fiscal management--including the obligation to maintain records on the number of recipients and their program costs--on the states. 7 C.F.R. Sec. 246.11(c) (1978). Pennsylvania maintained such a computer system, albeit one that lagged behind current data by several months. Thus, the regulations contemplated that the states would be in the ultimate position to determine whether program costs were exceeding allowable limits, and therefore whether a priority system was necessary. In the event that recipients were terminated by an unnecessary priority system, the fair hearings provided an obvious and convenient forum in which to correct this error.
 
 
 59
 Fair hearing review of priority systems is consistent as well with the efficient use of judicial and administrative resources. Were the City's position to prevail, recipients would have been obliged to seek collateral legal relief in state or federal court each time any locality imposed an arguably illegal priority system. Rather than requiring this cumbersome and inefficient check on erroneous local action, the regulations appear to contemplate that the propriety of local priority systems be decided by the agencies best suited to do so: state health agencies.
 
 
 60
 Consequently, we reject the City's position that the necessity of its priority system could not have been litigated in fair hearings. We must therefore remand to the district court for findings of fact on whether the Commonwealth would have held the hearings required by law and, if so, whether Commonwealth hearing officers would have reinstated the plaintiffs' benefits.
 
 
 61
 As noted above, the class plaintiffs also argue that the district court improperly allocated the burden of proof at trial. The district court's award of nominal damages to the class was not based upon any finding of fact. Rather, the court simply assumed the relevant facts arguendo, and based its award upon an erroneous legal conclusion. Allocations of the burden of proof at trial, of course, have meaning only for the proof of facts, not for the establishment of propositions of law. Thus it does not appear that the trial court actually ruled on which party had the burden of proof. On remand, however, allocation of the burden of proof will be a relevant issue. For that reason we should address it now.
 
 
 62
 In Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the Supreme Court approved at least implicitly the Seventh Circuit's holding that the burden of showing that the plaintiffs would not have prevailed is on the defendants. The "Court of Appeals held," the Supreme Court noted, "that if petitioners [defendants at trial] can prove on remand that '[respondents] [plaintiffs] would have been suspended even if a proper hearing had been held,' 545 F.2d 30 at 32 (1976), then respondents will not be entitled to recover damages to compensate them for injuries caused by the suspensions." 435 U.S. at 260, 98 S.Ct. at 1050. While the implicit approval of the Seventh Circuit rule allocating the burden to the party which denied the hearing may not have been essential to the Supreme Court's decision in Carey, it is consistent with the holding in the analogous case of Mount Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The plaintiff in Mount Healthy, a non-tenured teacher, challenged his discharge on first amendment grounds under Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Addressing the appropriate burdens of proof, the Supreme Court held:
 
 
 63
 Initially, in this case, the burden was properly placed upon respondent [plaintiff] to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor"--or, to put it in other words, that it was a "motivating factor" in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the [defendant] Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.
 
 
 64
 429 U.S. at 287, 97 S.Ct. at 576 (footnote omitted). We see no basis for allocating the burden of proof in a different fashion when the plaintiff's theory is the deprivation, without due process, of a property interest without the process required by federal law rather than an improper motive under Perry v. Sindermann. The Mount Healthy principle--that the establishment of a prima facie violation of law operates to shift the burden to the defendant to show that the plaintiff would have been discharged despite the allegedly illegal act--applies in the Carey v. Piphus context as well. See Hawkins v. Board of Public Education, 468 F.Supp. 201, 213-14 (D.Del.1979). Thus, on remand the City will have the burden of demonstrating either that the Commonwealth would not have held fair hearings upon request, or that the plaintiffs would not have prevailed at any such hearings had they been held.
 
 
 65
 The City further contends that, even assuming plaintiffs were entitled to a hearing and would have prevailed at such a hearing, they are entitled to only nominal damages. The City supports this contention by noting that Congress intended the WIC program to provide children under five years of age with nutritional food. The City reasons that, since plaintiffs are now older than five years and the specific congressional intent can no longer be furthered, money damages are inappropriate.
 
 
 66
 This argument is unpersuasive. Assuming that the district court finds that plaintiffs would have prevailed at the requisite hearing, the City's actions frustrated congressional intent and wrongfully deprived plaintiffs of benefits to which they were entitled. Plaintiffs either did without the benefits or procured them at personal expense. The City cannot avoid compensating for this loss by clothing itself in the very congressional intent which its actions frustrated. The district court did not err in its conclusion, analogizing to common law conversion, that the appropriate measure of damages is "the market value of the goods at the time and place of conversion." 572 F.Supp. at 620 (citing Knuth v. Erie-Crawford Dairy Cooperative Association, 463 F.2d 470, 478 (3d Cir.1972), cert. denied, 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973)).
 
 2. Money damages for Leon Truitt
 
 67
 The City does not contest the measure of Leon Truitt's damages, but maintains that an award of the cash equivalent of Truitt's damages against the City is inappropriate under the WIC Program. Rather, the City argues, the district court should have ordered injunctive relief against the Commonwealth in the form of "extended coverage"; that is the court should have "enjoin[ed] the State to provide the Class with WIC vouchers for the number of months they established their benefits were denied." Br. at 32. Of course, the plaintiffs sought no such remedy. Moreover, the City concedes, and the district court found, that such a remedy may be inappropriate because none of the plaintiffs remains eligible to receive benefits under the Program. 572 F.Supp. at 622 n. 29.
 
 
 68
 The choice among lawful remedies for the violation of constitutional rights is within the district court's discretion. In this case the plaintiffs sought no "extended coverage" relief against the Commonwealth. The court found in any event that injunctive relief directing the continuation of benefits would be inappropriate because none of the plaintiffs remains eligible for the Program. The parties have introduced evidence of the average voucher cost during the damage period. Thus the plaintiffs' damages are readily capable of reduction to monetary value. There is, moreover, at least a question whether injunctive relief in the form of "extended coverage" for persons ineligible for such coverage is not the equivalent of "equitable restitution" under Edelman v. Jordan, 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974), and therefore barred, as to the Commonwealth, by the eleventh amendment. We need not reach the eleventh amendment issue here, however. The district court's award of monetary relief against the City was certainly not an abuse of discretion.
 
 3. Damages for Andrea Carey
 
 69
 The district court found that Andrea Carey did not suffer significant emotional distress. In a footnote the court found Carey's humiliation less severe than other cases of emotional distress for which awards of between $250 and $750 have been made. 572 F.Supp. at 620 n. 26. Carey challenges this finding under Fed.R.Civ.P. 52(a), arguing that the underlying basis for this finding is insufficiently articulated, and seeks a remand for additional findings. There is no merit to this argument. The events leading to Carey's denial of benefits are unchallenged and were stated earlier by the court. The district court's ultimate finding of fact, assessed in light of these prior events, is not clearly erroneous.
 
 C. Liability of the Commonwealth
 
 70
 Lastly, the City maintains that the district court erred in holding the City alone liable for damages. The City argues that such an award amounts to punitive damages and is, in addition, inconsistent with the WIC regulations, which place the burden of conducting fair hearings on the Commonwealth. In lieu of monetary damages, the City argues, the district court should have awarded injunctive relief in the form of "extended coverage" against the Commonwealth.
 
 
 71
 These arguments are meritless. The City violated the WIC regulations by failing to provide notice of the right to fair hearings at the time of termination. At best the Commonwealth's failure to provide WIC hearings could have rendered the City and the Commonwealth jointly and severally liable. There is no basis in law for placing sole liability on the Commonwealth. Indeed that result would be extraordinary, for the plaintiffs presently seek no relief against the Commonwealth and the City has not cross-claimed against it. Nothing, moreover, suggests that compensatory relief against the City amounts to punitive damages.
 
 V. CONCLUSION
 
 72
 The district court's judgment will be affirmed insofar as it holds that the City violated 7 C.F.R. Sec. 246.24 (1978) by failing to give notice at the time of termination of the right to fair hearings before a Commonwealth hearing officer. The order will be reversed and remanded insofar as it awards only nominal damages to the class plaintiffs, for findings on (1) whether the Commonwealth would have held the required fair hearings had they been requested and, if so, (2) whether the plaintiffs would have prevailed at any such hearings. The award of compensatory damages for Leon Truitt and nominal damages for Andrea Carey will be affirmed.
 
 
 73
 SEITZ, Circuit Judge, concurring.
 
 
 74
 I am in substantial agreement with Judge Gibbons' opinion with one exception, and in full agreement with the conclusion he reaches in this case. The exception relates to his apparent holding, not prompted by any argument of counsel, that before a party may recover compensatory damages for the wrongful deprivation of a statutory entitlement to a hearing, he must show that he possessed a property interest in the substantive entitlement about which the hearing would have been concerned. If by "property interest" Judge Gibbons means only causally connected compensable damage, I would have no quarrel, but if he intends to employ the term in a "due process" context, I think such a test is not required.
 
 
 75
 Plaintiffs have established their standing to claim a violation of the federal statute. They have also proved that such a violation occurred when defendants terminated their benefits without a hearing. On remand, if it is established that plaintiffs would have prevailed at the requisite hearing and thus would have established their right to continue receiving benefits, then plaintiffs have been damaged by the violation in a manner that entitles them to compensatory damages.
 
 JAMES HUNTER, III, Circuit Judge, dissenting:
 
 76
 We fully agree with the majority opinion's affirmance of the district court's holding that the City violated the notice and hearing requirements of the regulations, and that such violation states a claim under section 1983, 42 U.S.C. Sec. 1983 (1982). We also agree that this statutory ground is dispositive, and thus that this court need not consider the fourteenth amendment due process claim.[1] We dissent, however, from the majority's conclusion that a remand is necessary to determine whether a hearing would have made a difference in the suspension of the class members' benefits.
 
 
 77
 The majority opinion concludes that the district court erred in assuming that the City would not comply with any decision by the Commonwealth to reinstate the class members to the WIC program, and thus that a hearing would not have benefited the class members. Although the majority's conclusion is legally sound, the fact of the matter is that the district court did not hinge its decision to award only nominal damages on this erroneous assumption. Instead, from the very beginning of this litigation, the district court's ratio decidendi was that the City acted legally and properly in dropping the class members from the WIC program. By concentrating on the district court's subsequent dictum, the majority opinion does not treat the actual holding below, and orders an unnecessary, and indeed duplicative, remand.
 
 
 78
 In its opinion denying preliminary injunctive relief to the class members, the district court stated the essential holding of this case. Noting that "[n]either the regulation nor the contract [with the Commonwealth] specifically repose exclusive authority to decide when to implement the priorities in either the state or the city agency," the district court found that the City, faced with its own forecast of funds exhaustion, was not foreclosed from implementing the priority system to bring the program within budget. 459 F.Supp. 883, 896 (E.D.Pa.1978). Indeed, the district court found that given the City's statistical figures and knowledge at the time of its decision, the Commonwealth's suspect monitoring system, and the Commonwealth's refusal to indemnify the City for possible program overruns, that the City acted reasonably and permissibly. 459 F.Supp. at 898. Thus, the district court held that even if the plaintiff class members were unlawfully denied process, they were properly removed from the WIC program. Id. We do not find, and the majority does not address, any error in this holding.
 
 
 79
 In its second opinion in this case, the district court incorporated its findings of fact and conclusions of law from the first opinion, 572 F.Supp. 605, 610 (E.D.Pa.1983), and reiterated its holding that "the City's choice [in implementing the priority scheme] was permissible and reasonable at the time." Id. at 612. The court then went on, however in response to an argument raised by plaintiffs, to discuss an alternative ground for its decision. Assuming "for the sake of argument," id. at 619, that the Commonwealth would have decided at a hearing that the City wrongfully implemented the priority system, the court opined that the City probably would have disregarded the Commonwealth anyway. Id. The majority opinion, by putting its focus on this extraneous discussion of the district court, effectively ignores the essential holding of the district court, and remands for further proceedings; proceedings, in our view, which are unnecessary. Because we find no reason to overrule the district court on its holding that the City, under the circumstances known to it at the time, properly implemented the priority system, we would affirm the district court's award of nominal damages only to the class plaintiffs.[2]
 
 
 
 [1]
 The statutory and regulatory provisions cited herein are those in force in 1977 and 1978. Amendments adopted in November of 1978 substantially modified a number of these provisions. Child Nutrition Amendments of 1978, Pub.L. No. 95-627, Sec. 3, 92 Stat. 3603, 3611-19 (codified as amended at 42 U.S.C. Sec. 1786 (1982))
 
 
 [2]
 The City has not cross-claimed against the Commonwealth. In its brief before us the City urges that the district court erred by failing to award injunctive relief in the form of "extended coverage" on behalf of the plaintiffs against the Commonwealth. Br. at 30-35. The plaintiffs have requested no such relief. The Commonwealth, in turn--defending against this argument by the City on behalf of the plaintiffs that the plaintiffs themselves have not raised--maintains that any such relief would violate the eleventh amendment. We address these arguments in Parts IV B 2 and IV C, infra
 
 
 [3]
 Section 1786(b)(1) provided for cash grants to local agencies
 to enable such agencies to carry out health and nutrition programs under which supplemental foods will be made available to pregnant or lactating women and to infants determined by competent professionals to be nutritional risks because of inadequate nutrition and inadequate income, in order to improve their health status.
 42 U.S.C.A. Sec. 1786(b)(1) (West 1978). The Act defines "supplemental foods" as "foods containing nutrients known to be lacking in the diets of populations at nutritional risk and, in particular, those foods and food products containing high-quality protein, iron, calcium, vitamin A, and vitamin C." 42 U.S.C.A. Sec. 1786(g)(3) (West 1978).
 
 
 [4]
 Section 246.3 provided:
 (b) The State agency is responsible for all operations under the Program within its jurisdiction and shall administer the Program in accordance with the requirements of this part .... The State agency shall provide guidance to local agencies on all aspects of Program operations.
 * * *
 (d) The local agency shall provide Program benefits to recipients in the most effective and efficient manner, and shall comply with this part ... and State agency ... guidelines and instructions.
 
 
 [7]
 C.F.R. Sec. 246.3 (1978)
 
 
 [5]
 Section 246.7(b)(2)(ii) provided:
 In determining a person's need for participation in the Program, the following priorities shall be applied when vacancies occur after a local agency has reached its maximum participation level:
 (A) Priority I. Pregnant women, breastfeeding women and infants in nutritional need as demonstrated by hematological or anthropometric measurements, or other documented medical conditions which demonstrate the person's need for supplemental foods.
 (B) Priority II. Infants (up to 6 months of age) of WIC recipients who participated during pregnancy, except for infants who qualify for Priority I.
 (C) Priority III. Children in nutritional need as demonstrated by hematological or anthropometric measurements or other documented medical conditions which demonstrate the child's need for supplemental foods.
 (D) Priority IV. Pregnant women, breastfeeding women, and infants in nutritional need because of an inadequate dietary pattern, as documented by a person qualified in such assessments.
 (E) Priority V. Children in nutritional need because of an inadequate dietary pattern, as documented by a person qualified in such assessments.
 (F) Priority VI. Postpartum women in nutritional need.
 
 
 [7]
 C.F.R. Sec. 246.7(b)(2)(ii) (1978)
 
 
 [6]
 Section 246.24 provided:
 (a) Each potential recipient shall be informed of the right to a fair hearing during the initial Program certification. Whenever a person is determined to be ineligible to participate in the Program, the person shall be notified in writing of the reason for his ineligibility and his right to a fair hearing.
 
 
 [7]
 C.F.R. Sec. 246.24(a) (1978). Subparagraph (b) described the nature of the hearing required in some detail. The hearing procedure was to provide:
 (1) A simple, publicly announced method for a person to make an oral or written request for a hearing;
 (2) An opportunity for the program [sic] to be assisted or represented by an attorney or other persons;
 (3) An opportunity to examine, prior to and during the hearing, the documents and records presented to support the decision under appeal;
 (4) That the hearing be held within three weeks from the date of receipt of request, be convenient to the person, and that a minimum of ten days written notice be given to the person as to the time and place of the hearing;
 (5) An opportunity for the person or his representative to present oral or documentary evidence and arguments supporting his position in accordance with procedures established by the hearing official, and that such procedures shall not be unduly complex or legalistic, and shall take into consideration the person's background and education;
 (6) An opportunity for the person or his representative to question or refute any testimony or other evidence and to confront and cross-examine any adverse witnesses;
 (7) That the hearing be conducted and the decision made by a hearing official who did not participate in making the decision under appeal or in any previously held conferences;
 (8) That the decision of the hearing official be based on the oral and documentary evidence presented at the hearing and that such decision be made a part of the hearing record;
 (9) That the person, and any designated representative, be notified in writing of the decision of the hearing official within 45 days from the date of the request for hearing;
 (10) That a written record be prepared with respect to each hearing, ....
 (11) That such written records of each hearing be preserved for a period of three years and be available for examination by the person, or his representative, at any reasonable time and place during such period.
 
 
 [7]
 C.F.R. Sec. 246.24(b) (1978). The Commonwealth's failure to establish a hearing procedure in conformance with these provisions prompted the plaintiffs to amend their complaint and add the Commonwealth as a party
 
 
 [7]
 See App. at 249:
 
 
 [2]
 Monthly Caseload allocation is: 15,000. The caseload allocation figure should be used as a guideline for the expenditure of funds. If agency participation reach[e]s caseload with food money remaining, the agency should serve more people up to the maximum food money allocation
 
 
 [8]
 Paragraph 20 of the agreement provided:
 
 
 [20]
 Food Expenses. Maximum food expenses for the contract period will not exceed $2,700,000.00 for the contract period [October 1977 to June 1978] or $300,000, per month
 App. at 254.
 
 
 [9]
 The district court declined to make a finding on whether the City's tally reached back three or six months, noting only that "City officials are no longer certain whether this manual tally went back for three months or for six." 572 F.Supp. at 610 n. 6
 
 
 [10]
 7 C.F.R. Sec. 246.15(a)(2) (1978) authorized this recapture of unspent funds by the Food and Nutrition Service of the Department of Agriculture
 
 
 [11]
 Part of this delay, the district court found, was inherent in a WIC regulation authorizing the issuance of vouchers for a three-month period at one time. 7 C.F.R. Sec. 246.10(d)(7), and in Program rules permitting the recipient to delay cashing vouchers for thirty days and vendors to delay submitting vouchers to Commonwealth authorities for sixty days. 572 F.Supp. at 610 n. 5
 
 
 [12]
 For the reasons discussed infra, Part IV A 2 c, we need not address whether the City's failure to provide WIC hearings violated due process
 
 
 [13]
 The court reasoned that a "forward adjustment" (that is, a reduction in the future cost of food vouchers) would be inappropriate because "1) no plaintiffs are still eligible to receive benefits under the WIC program as they are all well over five years of age; 2) the cost of benefits to recipients cannot be reduced because there is no charge to recipients in the WIC program; and 3) no evidence has been presented of abuse or potential abuse of WIC program vouchers necessitating such a remedy." 572 F.Supp. at 622 n. 29
 
 
 [14]
 The City objects to this reliance on subparagraph (b)--which defines the obligations of the Commonwealth--in construing the meaning of subparagraph (a). Br. at 15-16. There is no basis for this objection. Persons suspended from participation were plainly permitted to contest their suspensions; it would be irrational to suppose that these persons were authorized to contest their suspensions but not entitled to notice of this right
 
 
 [1]
 In this regard, we agree with Judge Seitz that Judge Gibbons' discussion of WIC eligibility as a "property interest" is unnecessary to the resolution of either the statutory claim or any damage claims. The class members base their statutory Sec. 1983 claim on the lack of notice and hearing. Once they establish that they were wrongfully denied this statutory process, a violation of Sec. 1983 exists. Whether the substantive right (i.e., WIC benefits) rises to the level of a "property interest" is irrelevant both to the establishment of the statutory claim and to any subsequent damage calculation. In Eder v. Beal, 609 F.2d 695 (3d Cir.1979), this court held that the "optional" nature of eyeglass benefits had no effect on a claim by beneficiaries that they were denied benefits without the requisite notice. The court reasoned that once a state elects to participate in even an "optional" program, they must comply with the Federal regulations that govern that program. To establish a claim for damages, therefore, the evidence need not show that WIC benefits rise to the level of a "property interest," but only that the grant of notice and hearing would have made a difference in the plaintiffs' removal from the WIC rolls, even if the benefits are "optional."
 
 
 [2]
 Because we disagree that a remand is necessary, we do not join in the majority opinion's discussion of burden of proof allocation