

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-17-2001

# S Camden Citizens v. NJ Dept Env Prot

Precedential or Non-Precedential:

Docket 01-2224

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"S Camden Citizens v. NJ Dept Env Prot" (2001). *2001 Decisions*. Paper 292.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/292

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 17, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 01-2224 and 01-2296

SOUTH CAMDEN CITIZENS IN ACTION;
GENEVA SANDERS; PAULINE WOODS;
BARBARA PFEIFER; JULITA GILLIARD;
OSCAR LISBOA; SHIRLEY RIOS;
PHYLLIS HOLMES; GWEN PETERSON;
LATOYA COOPER; JULIO LUGO

v.

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL
PROTECTION; ROBERT C. SHINN, JR.,
Commissioner of the NJ Dept. of Environmental
Protection, in his official capacity

ST. LAWRENCE CEMENT CO., L.L.C.,
Intervenor in D.C.,

         Appellant in No. 01-2224

SOUTH CAMDEN CITIZENS IN ACTION;
GENEVA SANDERS; PAULINE WOODS;
BARBARA PFEIFER; JULITA GILLIARD;
OSCAR LISBOA; SHIRLEY RIOS;
PHYLLIS HOLMES; GWEN PETERSON;
LATOYA COOPER; JULIO LUGO

v.

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL
PROTECTION; ROBERT C. SHINN, JR.,
Commissioner of the NJ Dept. of Environmental
Protection, in his official capacity

ST. LAWRENCE CEMENT CO., L.L.C.,
Intervenor in D.C.,

New Jersey Department of Environmental Protection;

Robert C. Shinn, Jr.,

Appellants in No. 01-2296

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 01-00702)
District Judge: Honorable Stephen M. Orlofsky

Argued September 25, 2001

BEFORE: MCKEE, AMBRO, and GREENBERG,
Circuit Judges

(Filed: December 17, 2001)

Olga D. Pomar (argued)
Camden Regional Legal Services
745 Market Street
Camden, NJ 08102
Jerome Balter
Michael Churchill (argued)
Public Interest Law Center of
Philadelphia
125 South 9th Street
Suite 700
Philadelphia, PA 19107
Luke W. Cole
Center on Race, Poverty & The
Environment
631 Howard Street
Suite 330
San Francisco, CA 94114

Attorneys for appellees
South Camden Citizens in Action,
Geneva Sanders, Pauline Woods,
Barbara Pfeifer, Julita Gilliard,
Oscar Lisboa, Shirley Rios, Phyllis
Holmes, Gwen Peterson, Latoya
Cooper, Julio Lugo

John J. Farmer, Jr.
Attorney General
Stefanie A. Brand (argued)
Deputy Attorney General
124 Halsey Street
P.O. Box 45029
Newark, NJ 07101
James M. Murphy
Patrick DeAlmeida
Deputy Attorneys General
Office of Attorney General of
New Jersey
Division of Law
Richard J. Hughes Justice Complex
P.O. Box 112
Trenton, NJ 08625

 Attorneys for appellants
New Jersey Department of
Environmental Protection and
Robert C. Shinn Jr.

Brian S. Montag (argued)
Catherine A. Trinkle
Pitney, Hardin, Kipp & Szuch
200 Campus Drive
Florham Park, NJ 07932

 Attorneys for appellant
St. Lawrence Cement Co.

Robin S. Conrad
National Chamber Litigation
 Center, Inc.
1615 H Street, N.W.
Washington, D.C. 200062
Robert R. Gasaway
Daryl Joseffer
Kirkland & Ellis
655 Fifteenth Street, N.W.
Washington, D.C. 20036

 Attorneys for amicus curiae
Chamber of Commerce of the
United States

James M. Sheehan
General Counsel
Commonwealth of Pennsylvania
Suite 225 Main Capitol Building
Harrisburg, PA 17120

Attorney for amicus curiae
Commonwealth of Pennsylvania

John P. Krill, Jr.
Linda J. Shorey
David R. Fine
Kirkpatrick & Lockhart LLP
240 North Third Street
Harrisburg, PA 17101

Attorneys for amici curiae
Robert C. Jubelirer and Matthew J.
Ryan

Frederick F. Fitchett, III
Jill Manuel-Coughlin
Cureton Caplan Hunt
Scaramella & Clark, P.C.
950B Chester Avenue
Delran, NJ 08075

Attorneys for amicus curiae
South Jersey Port Corporation

Michael W. Steinberg
Morgan, Lewis & Bockius LLP
1800 M Street, N.W.
Washington, D.C. 20036

Attorneys for amici curiae
National Association of
Manufacturers, American Chemistry
Council, and Chemistry Industry
Council of New Jersey

4

Daniel J. Popeo
Richard A. Samp
Washington Legal Foundation
2009 Massachusetts Ave., N.W.
Washington, D.C. 20036

 Attorneys for amici curiae
Washington Legal Foundation,
National Black Chamber of
Commerce, and Allied Educational
Foundation

Robert A. Matthews
Lawrence J. Joseph
McKenna & Cuneo, L.L.P.
1900 K Street, N.W.
Washington, D.C. 20006

 Attorneys for amicus curiae
American Road & Transportation
Builders Association

John J. Gibbons
Lawrence S. Lustberg
Risa E. Kaufman
Gibbons, Del Deo, Dolan,
Griffinger & Vecchione
One Riverfront Plaza
Newark, NJ 07102

 Attorneys for amici curiae
American Civil Liberties Union of
New Jersey Foundation and
American Civil Liberties Union of
Pennsylvania

5

Lawrence W. Lindsay
Justin T. Loughry
Loughry and Lindsay, LLC
309 Market Street
Camden, NJ 08102

 Attorneys for amici curiae
Bridge of Peace Community
Church, Fettersville Neighborhood
Task Force, Concerned Citizens of
North Camden, The Greater
Camden Unity Coalition,
Leavenhouse, South Jersey
Campaign for Peace and Justice,
Gray Panthers of South Jersey,
Dar Al Salaam/Africana Islamic
Mission, New Jersey Environmental
Federation, and Camden County
Green Party

Thomas Henderson, Esq.
Janette L. Wipper, Esq.
Lawyers' Committee for Civil Rights
Under Law
1408 New York Avenue, N.W.
Washington, D.C. 20005-2124
Robert J. Del Tufo
Ellen O'Connell
Skadden, Arps, Slate, Meagher &
 Flom LLP
One Newark Center - 18th Floor
Newark, NJ 07102
Dennis Courtland Hayes
National Association for the
Advancement of
Colored People
4801 Mount Hope Road
Baltimore, MD 21215
Ronald Thompson
Garden State Bar Association
Law Office of Ronald Thompson
213 South Harrison Street
East Orange, NJ 07018

6

Ken Kimerling
Margaret Fung
Asian American Legal Defense
and Education Fund
99 Hudson Street – 12th Floor
New York, NY 10013
Elaine R. Jones
Theodore M. Shaw
Norman J. Chachkin
NAACP Legal Defense &
Educational Fund, Inc.
99 Hudson Street, Suite 1600
New York, NY 10013-2897
Regina Waynes Joseph
Garden State Bar Association
320 South Harrison Street
16th Floor
East Orange, NJ 07018-1333

 Attorneys for amici curiae
Lawyers' Committee for Civil Rights
Under Law, National Association
for the Advancement of Colored
People, NAACP Legal Defense &
Educational Fund, Inc., Asian
American Legal Defense and
Education Fund and Garden State
Bar Association

Bradford Mank
University of Cincinnati
 College of Law
P.O. Box 210040
Cincinnati, OH 45221-0040

 Attorney for amici curiae
Law Professors Concerned about
Environmental Justice

7

Julie H. Hurwitz
Alma L. Lowry
National Lawyers' Guild/
 Maurice and
Jane Sugar Law Center for
Economic and
Social Justice
645 Griswold, Suite 1800
Detroit, MI 48266
Denise Hoffner-Brodsky
The Sierra Club
85 Second Street, 2nd Floor
San Francisco, CA 94105
Douglas W. Henkin
Michele Host
Milbank, Tweed, Hadley &
 McCloy, LLP
1 Chase Manhattan Plaza
New York, NY 10005-1413

 Attorneys for amici curiae
Center for Constitutional Rights,
Center for Law in the Public
Interest, National Health Law
Program, National Senior Citizens
Law Center, New York City
Coalition to End Lead Poisoning,
New York Lawyers for the Public
Interest, National Lawyers'
Guild/Maurice and Jane Sugar
Law Center for Social and
Economic Justice, Puerto Rican
Legal Defense and Education Fund,
and the Sierra Club

8

          Michelle B. Alvarez
          Mark A. Izeman
          Eric A. Goldstein
          Natural Resources Defense Council
          40 West 20th Street
          New York, NY 10011

           Attorneys for amici curiae
          Natural Resources Defense Council
          and Environmental Defense

OPINION OF THE COURT

GREENBERG, Circuit Judge:

I. OVERVIEW

This matter comes on before this court on appeals
by defendant-appellant New Jersey Department of
Environmental Protection ("NJDEP") and intervenor-
appellant St. Lawrence Cement Co., L.L.C. ("St. Lawrence")
from the district court's order granting preliminary
injunctive relief to plaintiffs, South Camden Citizens in
Action and ten residents of the Waterfront South
neighborhood of Camden, New Jersey. Plaintiffs brought
this action pursuant to 42 U.S.C. S 1983, as well as on
other bases, claiming NJDEP discriminated against them by
issuing an air permit to St. Lawrence to operate a facility
that would have an adverse disparate racial impact upon
them in violation of Title VI of the Civil Rights Act of 1964,
42 U.S.C. SS 2000d to 2000d-7.

Our opinion focuses on whether, following the Supreme
Court's recent decision in Alexander v. Sandoval , 532 U.S.
275, 121 S.Ct. 1511 (2001), plaintiffs can maintain this
action under section 1983 for disparate impact
discrimination in violation of Title VI and its implementing
regulations. For the reasons we set forth, we hold that an
administrative regulation cannot create an interest
enforceable under section 1983 unless the interest already
is implicit in the statute authorizing the regulation, and
that inasmuch as Title VI proscribes only intentional

9

discrimination, the plaintiffs do not have a right enforceable through a 1983 action under the EPA's disparate impact discrimination regulations. Because the district court predicated its order granting injunctive relief on section 1983, we will reverse.

II. BACKGROUND AND PROCEDURAL HISTORY

A. Background

As we ultimately decide this appeal on a legal basis and the district court's opinions stated the facts at length, we only need summarize the factual background of this case. Initially, we point out that the residents of Waterfront South are predominately minorities and the neighborhood is disadvantaged environmentally.[1] Waterfront South contains two Superfund sites, several contaminated and abandoned industrial sites, and many currently operating facilities, including chemical companies, waste facilities, food processing companies, automotive shops, and a petroleum coke transfer station. Moreover, NJDEP has granted permits for operation of a regional sewage treatment plant, a trash-to-steam incinerator and a co-generation power plant in the neighborhood. As a result, Waterfront South, though only one of 23 Camden neighborhoods, hosts 20% of the city's contaminated sites and, on average, has more than twice the number of facilities with permits to emit air pollution than exist in the area encompassed within a typical New Jersey zip code.

St. Lawrence supplies cement materials, primarily to the ready-mix concrete industry. One aspect of St. Lawrence's business is the processing of ground granulated blast furnace slag ("GBFS"), a sand-like by-product of the steel-making industry, used in portland cement. In 1998, St. Lawrence wanted to open a GBFS grinding facility on a site in Camden owned by the South Jersey Port Corporation (the "Port"). In furtherance of this project, in March 1999 St. Lawrence signed a lease with the Port for the site and initiated discussions with NJDEP with respect to obtaining

_____

1. The Waterfront South community is comprised of 63% African-American, 28.3% Hispanic, and 9% white residents.

10

construction and operation permits for the facility, primarily focusing on the air permit that required minimizing the emission of PM10, i.e., particulate matter with a diameter of 10 microns or less. NJDEP required St. Lawrence to conduct an air quality impact analysis for PM10 confirming that there would not be adverse health impacts from operation of the facility and that St. Lawrence's operations complied with the National Ambient Air Quality Standards for PM10. St. Lawrence completed the analysis, and NJDEP accepted the result that the facility's emissions would satisfy the established standards applicable to its operation.

On November 1, 1999, NJDEP notified St. Lawrence that the permit process was "administratively complete." Accordingly, NJDEP permitted St. Lawrence to begin construction of the facility, which it did in late 1999. Then, on July 25, 2000, NJDEP gave notice of a public hearing to be held on August 23, 2000, addressing St. Lawrence's draft air permit. NJDEP stated, however, that it would accept written comments on the draft permit until August 31, 2000. Approximately 120 community members voiced their opinions and concerns about St. Lawrence's facility at the hearing, and several individuals provided NJDEP with written comments.

Thereafter, NJDEP issued a 33-page "Hearing Officer's Report Responses to Public Comments on the Draft Air Permit" for St. Lawrence. In the report, NJDEP addressed the concerns raised by community members, including environmental equity/environmental justice, preexisting local environmental issues, St. Lawrence's emission limits, the results of St. Lawrence's air quality impact analysis, truck emission standards and carbon monoxide air quality evaluation results, and the protection of the health and safety of Waterfront South residents. Plaintiffs, however, filed an administrative complaint with the EPA and a request for a grievance hearing with NJDEP, as they alleged that NJDEP's permit review procedures violated Title VI of the Civil Rights Act of 1964 because the procedures did not include an analysis of the allegedly racially disparate adverse impact of the facility. NJDEP did not respond to the grievance hearing request, and on October 31, 2000, issued St. Lawrence's final air permit.

11

B. Procedural History

On February 13, 2001, plaintiffs filed a complaint against NJDEP and NJDEP Commissioner Robert C. Shinn, Jr., alleging that they violated Title VI by intentionally discriminating against them in violation of section 601, 42 U.S.C. S 2000d, by issuing the air quality permit and further asserting that the facility in operation under the air permit would have an adverse disparate impact on them in violation of section 602, 42 U.S.C. S 2000d-1. St. Lawrence subsequently intervened with the consent of the parties. Following the submission of briefs and expert reports and oral argument, the district court issued an opinion and order on April 19, 2001, granting plaintiffs' request for a preliminary injunction. See South Camden Citizens in Action v. N.J. Dep't of Envtl. Prot., 145 F. Supp. 2d 446, 505 (D.N.J. 2001) ("South Camden I"). In reaching its conclusions, the court found that section 602 and its implementing regulations contained an implied private right of action. Therefore, inasmuch as the court found that plaintiffs otherwise were entitled to relief based on their disparate impact claim, it remanded the matter to NJDEP for a Title VI analysis. See id. at 473-84, 505.

South Camden I, however, had a short shelf life. On April 24, 2001, the Supreme Court issued its decision in Sandoval, 532 U.S. 275, 121 S.Ct. 1511, holding that "[n]either as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under S 602. We therefore hold that no such right of action exists." Id. at ___, 121 S.Ct. at 1523 (footnote omitted). Obviously, Sandoval eliminated the basis for the court's injunction in South Camden I, an effect that led St. Lawrence to move to dissolve the injunction. The district court, however, denied the motion, following which St. Lawrence again sought similar relief or a stay of the injunction pending appeal. The district court then allowed plaintiffs to amend their complaint to add a claim to enforce section 602 through section 1983. The court also required supplemental briefing on plaintiffs' remaining claims, namely, whether plaintiffs' intentional discrimination charge and/or their section 1983 claim

12

could provide an alternate basis for relief. On May 10, 2001, the court issued a supplemental opinion and order continuing the preliminary injunction based on plaintiffs' section 1983 claim and again remanding the matter to NJDEP for a Title VI analysis. See South Camden Citizens in Action v. N.J. Dep't of Envtl. Prot., 145 F. Supp. 2d 505 (D.N.J. 2001) (South Camden II). In reaching its result the court relied, inter alia, on Powell v. Ridge, 189 F.3d 387, 403 (3d Cir.), cert. denied, 528 U.S. 1046, 120 S.Ct. 579 (1999), in which we held that there was a private right of action available to enforce a regulation implementing Title VI and that a disparate impact discrimination claim could be maintained under section 1983 for a violation of a regulation promulgated pursuant to section 602. See South Camden II, 145 F. Supp. 2d at 520, 525, 543. Immediately thereafter, St. Lawrence unsuccessfully moved in the district court for a stay of the preliminary injunction pending appeal.

St. Lawrence appealed to this court, and on May 15, 2001, filed with us a motion to suspend or, in the alternative, to modify the preliminary injunction pending appeal, as well as a request for expedited review of the appeal. On May 29, 2001, NJDEP requested a stay of the remand process from the district court, but on June 4, 2001, the district court denied that request. NJDEP then made the same application to this court on June 6, 2001, but we denied its motion on June 11, 2001. On June 12, 2001, however, we granted St. Lawrence's request for expedited review, and on June 15, 2001, we granted St. Lawrence's request to suspend the preliminary injunction pending appeal.

III. DISCUSSION

As we have indicated, plaintiffs in their amended complaint sought an injunction under section 1983 preventing operation of St. Lawrence's GBFS grinding facility.2 The district court found that plaintiffs stated a
_____

2. The district court had jurisdiction over this matter pursuant to 28 U.S.C. SS 1331, 1343, and we have jurisdiction pursuant to 28 U.S.C. S 1292(a)(1).

13

claim under section 1983 against NJDEP for violating section 602 and its implementing regulations by failing to consider the potentially adverse discriminatory impact of permitting operation of the facility, and therefore enjoined its operation until NJDEP made such a determination. 3 We review the district court's order granting a preliminary injunction for abuse of discretion, although we review factual findings for clear error and questions of law de novo. See AT&T v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1426–27 (3d Cir. 1994).

We often have recognized that injunctive relief, particularly preliminary relief, is an "extraordinary remedy . . . which should be granted only in limited circumstances." Id. (citation omitted). To obtain a preliminary injunction, the moving party must demonstrate: (1) the reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured if relief is not granted. Moreover, the district court also should take into account, when relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest. See In re Arthur Treacher's Franchisee Litig., 689 F.2d 1137, 1143 (3d Cir. 1982). Thus, "a failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction." Id. at 1143.

We first consider the probability of plaintiffs' success in the litigation and, indeed, as we find that their case is legally insufficient, we will go no further. Naturally, in view of Sandoval, the overarching legal issue on this appeal is whether plaintiffs can advance a cause of action to enforce section 602 of Title VI and its implementing regulations through section 1983. If they cannot, then the only basis on which they can obtain relief is to demonstrate that the NJDEP engaged in intentional discrimination, a possibility that we do not address on this appeal.

_____

3. The parties agree that the NJDEP receives grants of federal financial assistance so as to be subject to Title VI of the Civil Rights Act of 1964,
including sections 601 and 602.

14

We start our legal analysis with a consideration of Sandoval in which the Court held that a private right of action is not available to enforce disparate impact regulations promulgated under Title VI,[4] thus overruling Powell at least to the extent that it held to the contrary. See Sandoval, 532 U.S. at ___, 121 S. Ct. at 1523. In Sandoval,

---

4. We have set forth conditions that can lead to the recognition of a private right of action not explicitly created as follows:

> When a statute does not explicitly supply a private right of
> action,
> two occasionally intersecting avenues may be explored for a
> possible
> private right of enforcement. First, an implied private right of
> action
> to enforce the statute may exist directly under the statute in
> accordance with the four-factor analysis of Cort v. Ash, 422 U.S.
> 66,
> 78, 95 S.Ct. 2080, 2088 (1975). To establish an implied private
> right
> of action under Cort v. Ash, the plaintiff must satisfy the first
> requirement--that the statute creates a federal right in favor of
> the
> plaintiff. The plaintiff must then satisfy the three remaining Cort
> v.
> Ash requirements relating to the existence of a remedy--that
> Congress intended to create a remedy, that the remedy is consistent
> with the legislative scheme, and that the cause of action is not
> traditionally relegated to state law. In sum, under Cort v. Ash the
> plaintiff bears the burden of establishing not only the existence
> of a
> right, but also the existence of an intended private remedy.
>
>  In appropriate cases, the second avenue for private enforcement of
> a federal statute is S 1983. In determining whether a private right
> of
> action exists under S 1983, only two inquiries are relevant: one,
> whether the statute alleged to have been violated creates a federal
> right in favor of the plaintiff, and the other, whether Congress
> has
> foreclosed the remedy of private enforcement. TheS 1983 analysis
> intersects with the Cort v. Ash analysis insofar as the plaintiff
> under
> both analyses must establish the creation of a federal right. With
> respect to the existence of a remedy, however, the contrast between
> the two analyses is stark. Under Cort v. Ash the plaintiff must
> establish that Congress intended the remedy. UnderS 1983
> analysis, on the other hand, once a federal right is established,
> the

existence of a remedy is presumed because S 1983 itself provides the

authorization for private enforcement. The burden is on the defendant to establish that Congress intended to foreclose private enforcement.

W. Va. Univ. Hosp. v. Casey, 885 F.2d 11, 18 n.1 (3d Cir. 1989). In Sandoval, the Court focused exclusively on whether Congress had created a federal right in favor of the plaintiff, the same essential question at issue here.

15

the Court considered a challenge to the Alabama Department of Public Safety's official policy of administering its driver's license examination only in English as violative of Title VI and its implementing regulations. See id. at ___, 121 S.Ct. at 1515. The Court held that "[n]either as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated underS 602. We therefore hold that no such right of action exists." Id. at ___, 121 S.Ct. at 1523. *In reaching its result in Sandoval, the Court began by listing three aspects of Title VI that "must be taken as given": (1) private individuals may sue to enforce section 601 of Title VI and obtain both injunctive relief and damages; (2) section 601 prohibits only intentional discrimination; and (3) for the purposes of the case, regulations promulgated pursuant to section 602 validly may proscribe disparate impact discrimination even though it is permissible under section 601. See id. at ___, 121 S.Ct. at 1516–17. Then, the Court considered whether section 602 regulations conferred a private right of action, looking to its precedent interpreting Title VI and to the text and structure of Title VI. See id. at ___, 121 S.Ct. at 1519. First, the Court noted, based on its analysis of its holdings in its prior Title VI cases, that it previously had not held that there is such a private right of action under section 602. See id. at ___, 121 S.Ct. at 1517–21 (citing Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786 (1974) (holding that section 601 prohibits disparate impact discrimination); Cannon v. Univ. of Chicago, 441 U.S. 677, 694, 99 S.Ct. 1946, 1956 (1979) (holding that private right of action exists to enforce Title IX, which is patterned after Title VI); Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 287, 98 S.Ct. 2733, 2746 (1978) (holding, contrary to Lau, that section 601 proscribes only those classifications that would violate the Equal Protection Clause of the Fifth Amendment, namely intentional discrimination); Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 103 S.Ct. 3221 (1983) (affirming Bakke's holding that section 601 prohibits only intentional discrimination); Alexander v. Choate , 469 U.S. 287, 293, 105 S.Ct. 712, 716 (1985) (same)).

The Court then found that section 602's text and structure did not evince an intent to create a private right

16

of action and that the regulations alone were insufficient to create a private right of action. See id. at ___, 121 S.Ct. at 1520-22 ("Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not."). Therefore, the Court held that a private right of action was not available to enforce regulations promulgated under section 602. See id. at ___, 121 S.Ct. at 1523. However, inasmuch as the plaintiffs in Sandoval did not advance a cause of action under section 1983 to enforce Title VI and its implementing regulations, the majority did not consider whether such an action is available.5

Resolution of this issue, therefore, requires us to examine whether disparate impact regulations promulgated pursuant to section 602 may, and if so do, create a right that may be enforced through a section 1983 action.

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to

_____

5. In his dissent, Justice Stevens stated the following with regard to section 1983:

> [T]o the extent that the majority denies relief to the respondents merely because they neglected to mention 42 U.S.C.S 1983 in framing their Title VI claim, this case is something of a sport. Litigants who in the future wish to enforce the Title VI regulations against state actors in all likelihood must only reference S 1983 to obtain relief; indeed, the plaintiffs in this case (or other similarly situated individuals) presumably retain the option of re-challenging Alabama's English-only policy in a complaint that invokes S 1983 even after today's decision.

Sandoval, 532 U.S. at ___, 121 S.Ct. at 1527 (Stevens, J., dissenting). The majority does not address the dissent's statement. Nevertheless, for the reasons that follow, we conclude that the majority's opinion and Supreme Court precedent do not permit the bringing of the section 1983 action that Justice Stevens suggested is available.

the party injured in any action at law, suit in equity, or other proper proceeding for redress.

Therefore, section 1983 provides a remedy for deprivation under color of state law of "any rights . . . secured by the Constitution and laws." In Maine v. Thiboutot , 448 U.S. 1, 6–8, 100 S.Ct. 2504, 2505–06 (1980), the Supreme Court interpreted this language and held that causes of action under section 1983 are not limited to claims based on constitutional or equal rights violations. Rather, certain rights created under federal statutes are enforceable through section 1983 as well. This rule, however, is limited by two well-recognized exceptions. First, a section 1983 remedy is not available "where Congress has foreclosed such enforcement of the statute in the enactment itself." Wright v. City of Roanoke Redevelopment & Hous. Auth., 479 U.S. 418, 423, 107 S.Ct. 766, 770 (1987). Second, the remedy is not available "where the statute did not create enforceable rights, privileges, or immunities within the meaning of S 1983." Id.

The Supreme Court has established a three-part test to determine whether a federal statute creates an individual right enforceable through a section 1983 action:

First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so `vague and amorphous' that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

Blessing v. Freestone, 520 U.S. 329, 340–41, 117 S.Ct. 1353, 1359–60 (1997). If a plaintiff satisfies each of these elements, and therefore establishes and identifies a federal right that allegedly has been violated, a rebuttable presumption that the right is enforceable through section 1983 arises. See id. at 341, 117 S.Ct. at 1360; see also Banks v. Dallas Housing Auth., 271 F.3d 605, 2001 WL 1285391, at *4 (5th Cir. Oct. 24, 2001). We have found two circumstances, which in harmony with Wright, are

18

sufficient to rebut this presumption: where "Congress specifically foreclosed a remedy under S 1983,[either] expressly, by forbidding recourse to S 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under S 1983." Powell, 189 F.3d at 401 (citations omitted). In the former case, the plaintiff 's claim must fail. In the latter case, however, the burden shifts to the defendant to "make the difficult showing that allowing a S 1983 action to go forward in these circumstances `would be inconsistent with Congress' carefully tailored scheme.' " Id. (quoting Blessing, 520 U.S. at 346, 117 S.Ct. at 1362).

Here, plaintiffs seek to enforce a prohibition on disparate impact discrimination that does not appear explicitly in Title VI, but rather is set forth in EPA regulations. They contend that the regulations are a valid interpretation of Title VI.6 Section 601 of Title VI provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. S 2000d. Section 602 provides, in relevant part:

> Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d [Section 601] of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the

_____

6. We assume without deciding that the regulations are valid, as neither NJDEP nor St. Lawrence timely challenged them in the district court and our analysis does not turn on their validity. That being said, like the Court stated in Sandoval, we observe that there does seem to be considerable tension between the section 602 regulations proscribing activities that have a disparate impact and section 601's limitation to interdiction only of intentionally discriminatory activities. See Sandoval,
532 U.S. at ___, 121 S.Ct. at 1517.

> objectives of the statute authorizing financial
> assistance in connection with which the action is
> taken.

Id. S 2000d-1. Finally, the EPA regulations at issue provide:

> No person shall be excluded from participation in,
> be denied the benefits of, or be subjected to
> discrimination under any program or activity receiving
> EPA assistance on the basis of race, color, [or] national
> origin . . . .
>
> . . .
>
>  A recipient shall not use criteria or methods of
> administering its program which have the effect of
> subjecting individuals to discrimination because of
> their race, color, national origin, or sex, or have the
> effect of defeating or substantially impairing
> accomplishment of the objectives of the program with
> respect to individuals of a particular race, color,
> national origin, or sex.

40 C.F.R. SS 7.30 & 7.35(b). According to plaintiffs, these statutory provisions and their complementary regulations prohibiting discriminatory impacts in administering programs create a federal right enforceable through section 1983.

This contention raises the question of whether a regulation can create a right enforceable through section 1983 where the alleged right does not appear explicitly in the statute, but only appears in the regulation. The district court found that the Supreme Court, as well as this court, have found that a regulation may create an enforceable right, see South Camden II, 145 F. Supp. 2d at 526-27 (citing Wright, 479 U.S. at 418, 107 S.Ct. at 766; W. Va. Univ. Hosp. v. Casey, 885 F.2d 11, 18 (3d Cir. 1989); Alexander v. Polk, 750 F.2d 250 (3d Cir. 1984)), and therefore concluded that the three-prong Blessing test applied to determine whether the EPA regulations indeed created a federal right. See id. at 529. For the reasons that follow, however, we are satisfied that the district court's conclusion was erroneous. Thus, as the plaintiffs do not advance any federal right to enforce, the district court erred in granting relief on the basis of section 1983.

20

In considering whether a regulation in itself can establish a right enforceable under section 1983, we initially point out that a majority of the Supreme Court never has stated expressly that a valid regulation can create such a right. In Guardians Ass'n Justice Stevens, joined by Justices Brennan and Blackmun, wrote: "[I]t is clear that the S 1983 remedy is intended to redress the deprivation of rights secured by all valid federal laws, including statutes and regulations having the force of law." See Guardians Ass'n, 463 U.S. at 638, 103 S.Ct. at 3251. According to them, the rationale of Thiboutot applied equally to statutes and administrative regulations having the force of law. See id. at 638 n.6, 103 S.Ct. at 3251 n.6. But later in Wright, four Justices expressed the contrary view. See Wright , 479 U.S. at 437–38, 107 S.Ct. at 777–78 (O'Connor, J., dissenting). Justice O'Connor, joined by Chief Justice Rehnquist, Justice Powell, and Justice Scalia, wrote in dissent:

> In the absence of any indication in the language, legislative history, or administrative interpretation of the Brooke Amendment that Congress intended to create an enforceable right to utilities, it is necessary to ask whether administrative regulations alone could create such a right. This is a troubling issue not briefed by the parties, and I do not attempt to resolve it here. The Court's questionable reasoning that, because for four years HUD gave somewhat less discretion to the PHA's in setting reasonable utilities allowances, HUD understood Congress to have required enforceable utility standards, apparently allows it to sidestep the question. I am concerned, however, that lurking behind the Court's analysis may be the view that, once it has been found that a statute creates some enforceable right, any regulation adopted within the purview of the statute creates rights enforceable in federal courts, regardless of whether Congress or the promulgating agency ever contemplated such a result. Thus, HUD's frequently changing views on how best to administer the provision of utilities to public housing tenants becomes the focal point for the creation and extinguishment of federal `rights.' Such a result, where determination of S 1983 `rights' has been unleashed

21

> from any connection to congressional intent, is
> troubling indeed.

Id.

Notwithstanding the foregoing cautionary language, the
district court relied on Wright in holding that federal
regulations may create rights enforceable through section
1983. In Wright, the plaintiffs alleged the housing authority
violated a federal statute imposing a rent ceiling and the
statute's implementing regulations which required public
housing authorities to include a reasonable utility
allowance in tenants' rent. See id. at 419, 107 S.Ct. at 768.
The defendants argued that neither the statute nor the
regulations gave the tenants a right enforceable through
section 1983. See id. at 429-30, 107 S.Ct. at 773. In
response, the Court stated:

> We perceive little substance in this claim. The Brooke
> Amendment could not be clearer: as further amended
> in 1981, tenants could be charged as rent no more and
> no less than 30 percent of their income. This was a
> mandatory limitation focusing on the individual family
> and its income. The intent to benefit tenants is
> undeniable. Nor is there any question that HUD
> interim regulations, in effect when this suit began,
> expressly required that a `reasonable' amount for
> utilities be included in rent that a PHA was allowed to
> charge, an interpretation to which HUD has adhered
> both before and after the adoption of the Brooke
> Amendment. HUD's view is entitled to deference as a
> valid interpretation of the statute, and Congress in the
> course of amending that provision, has not disagreed
> with it.
>
> Respondent nevertheless asserts that the provision
> for a `reasonable' allowance for utilities is too vague
> and amorphous to confer on tenants an enforceable
> `right' within the meaning of S 1983 and that the whole
> matter of utility allowances must be left to the
> discretion of the PHA, subject to supervision by HUD.
> The regulations, however, defining the statutory
> concept of `rent' as including utilities, have the force of
> law . . ., they specifically set out guidelines that the

22

> PHAs were to follow in establishing utility allowances, and they require notice to tenants and an opportunity to comment on proposed allowances. In our view, the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under Pennhurst [State School & Hospital v. Halderman, 451 U.S. 1, 101 S.Ct. 1531 (1981)] and S 1983, rights that are not, as respondent suggests, beyond the competence of the judiciary to enforce.

Id. at 430-32, 107 S.Ct. at 773-75 (footnotes omitted).7

As we have indicated, the district court held, and the appellees argue here, that Wright stands for the proposition that valid federal regulations may create rights enforceable under section 1983, to which the Blessing analysis applies. Therefore, the appellees argue that because the EPA's section 602 regulations are valid and enforceable, we should apply the Blessing analysis and conclude that the regulations create rights enforceable through section 1983.

The district court's holding was, however, erroneous because, as the foregoing quotation from the Court's opinion makes clear, Wright dealt with an issue that differs from that presented in the district court and here. There, the Court, in finding the statute and its implementing regulations created a right enforceable through section 1983, focused on tying the right to a reasonable utility allowance to Congress' intent to create federal rights through the statute. The Court looked first to the statutory provision creating the ceiling on tenants' rent, describing it as "a mandatory limitation focusing on the individual family and its income." Id. at 430, 107 S.Ct. at 773-74. Further, it stated that Congress' intent with regard to the statute to benefit tenants was "undeniable." Id. at 430, 107 S.Ct. at 774. Having reached this conclusion, it turned to the regulations and found that they were entitled to deference

_____

7. The Court of Appeals for the Fifth Circuit recently in Banks v. Dallas Housing Authority, 271 F.3d 605, 2001 WL 1285391, at *4, indicated that a statutory obligation in 42 U.S.C. S 1437f(e) (repealed) to provide "decent, safe, and sanitary" housing was too vague to be judicially enforceable under section 1983, distinguishing Wright.

23

as valid administrative interpretations of the statute. Id., 107 S.Ct. at 774. It afforded this deference, however, after having found that Congress had conferred upon plaintiffs that right by statute. Id., 107 S.Ct. at 773.

Clearly, therefore, the regulation at issue in Wright merely defined the specific right that Congress already had conferred through the statute. See id. at 430 n.11 & 431, 107 S.Ct. at 774 & n.11 (rejecting "respondent's argument that the Brooke Amendment's rent ceiling applies only to the charge for shelter and that the HUD definition of rent as including a reasonable charge for utilities is not authorized by the statute" and stating regulations "defin[ed] the statutory concept of `rent' "). There should be no doubt on this point, for the Court plainly stated that"the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under Pennhurst and S 1983, rights that are not, as respondent suggests, beyond the competence of the judiciary to enforce." Id. at 432, 107 S.Ct. at 774-75 (emphasis added). Therefore, the Wright Court located the alleged right in the statutory provision and then relied upon the implementing regulations to define and interpret that right. Critically, as pertains to this case, Wright does not hold that a regulation alone--i.e., where the alleged right does not appear explicitly in the statute, but only appears in the regulation --may create an enforceable federal right. It is thus manifest that, inasmuch as the disparate impact regulations go far beyond the intentional discrimination interdiction in section 601, the district court's reliance on Wright was misplaced.

Similarly, although also relied upon by the district court, none of our opinions in Alexander, Casey , or Powell nor that of the Court of Appeals for the Ninth Circuit in Buckley v. City of Redding, 66 F.3d 188 (9th Cir. 1995), justifies the district court's conclusion that valid regulations may create rights enforceable under section 1983. In Alexander, we held that federal regulations governing the administration of the Supplemental Food Program for Women, Infants and Children created rights enforceable under section 1983 for recipients of program assistance. See Alexander , 750 F.2d at 261. But the right enforceable through section 1983,

24

namely notice of the right to a fair hearing upon termination of benefits, could be traced to and was consistent with the statute as it provided for cash grants to local agencies to enable them to carry out health and nutrition programs to make supplemental food available to pregnant and lactating women and infants. Accordingly, the statute created a right to supplemental food for those who qualified. See id. at 253 & n.3.

We recognize that in Alexander we never expressly identified the right as stemming from the statute. Nevertheless we did not expressly analyze the question of whether a federal regulation could create an enforceable section 1983 right. Instead, after stating the general rule that violations of federal statutes may be actionable under section 1983 except where Congress has foreclosed section 1983 enforcement or the statute does not create enforceable rights, we simply concluded that the regulation created an enforceable right. See id. at 259.

But Alexander did not involve a circumstance in which the regulations attempted to create a federal right beyond any that Congress intended to create in enacting the statute. Furthermore, we decided Alexander in 1984, well before the Supreme Court refined its analysis to focus directly on Congress' intent to create enforceable rights and to confine its holdings to the limits of that intent. See Blessing, 520 U.S. at 341, 117 S.Ct. at 1360-61 (concentrating on Congress' intent to create rights in statute enforceable through section 1983); Suter v. Artist M., 503 U.S. 347, 357, 112 S.Ct. 1360, 1367 (1992) (same); Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 510, 110 S.Ct. 2510, 2517-18 (1990) (same); Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110-11, 110 S.Ct. 444, 451 (1989) (same); Wright, 479 U.S. at 430, 107 S.Ct. at 774 (focusing on Congress' intent to create rights in statute enforceable through section 1983, and finding implementing regulation defined right). Therefore, Alexander is distinguishable from this case.

So, too, is Casey. There, we stated, citing only Wright and Alexander, that "valid federal regulations as well as federal statutes may create rights enforceable under section 1983." Casey, 885 F.2d at 18. The issue in Casey , however, was

25

only whether the federal Medicaid statute, not its implementing regulations, created a federal right enforceable through section 1983. See id. at 17 ("The threshold issue in this case is whether [the plaintiff] can assert a cause of action against the defendant state officials under 42 U.S.C. S 1983 for alleged violation of the federal medicaid statute."). Therefore, our broader statement was dicta not binding here.

Plaintiffs place much reliance on Powell v. Ridge, 189 F.3d at 403, in which we indicated that a disparate impact discrimination claim could be maintained under section 1983 for a violation of a regulation promulgated pursuant to section 602. There, the plaintiffs brought a Title VI action against the Commonwealth of Pennsylvania, challenging its practices in funding public education on the ground that they had a racially discriminatory effect. See id. at 391. On appeal, we considered, among other things, whether there was a private right of action available to enforce a regulation implementing Title VI, as well as whether a plaintiff can maintain a claim under section 1983 for a violation of that regulation. See id. We answered both questions in the affirmative, stating that section 602 and the Department of Education regulation at issue provided a private right of action, and that plaintiffs also could utilize section 1983 to redress defendants' alleged violation of the statute and regulation. See id. at 399-400, 403.

Powell, however, should not be overread. Initially, it held that section 602 and the regulations under it included a private right of action. Moreover, in then authorizing the section 1983 action we merely rejected three specific arguments: (1) that the individual defendants were not "persons" amenable to suit under section 1983; 8 (2) that Title VI possessed a comprehensive enforcement scheme that precluded the assertion of the section 1983 claim; and (3) that our precedents barring certain claims under Title IX of the Education Amendments of 1972 should have barred the action in Powell as well. See Powell , 189 F.3d at 400-03. But Powell did not analyze the foundation issue that is

_____

8. On appeal, the defendants did not advance this argument even though the district court had relied on it. See Powell , 189 F.3d at 401.

26

central here, i.e., whether a regulation in itself can create a right enforceable under section 1983. In Powell , we seemed simply to assume for section 1983 purposes that it could. See id. at 401 ("Once a plaintiff has identified a federal right that has allegedly been violated, there arises a `rebuttable presumption that the right is enforceable under S 1983.' "). Thus, while plaintiffs rely heavily on Powell, that reliance is misplaced, and, accordingly, quite aside from the impact of Sandoval, Powell could not control the outcome here.9

Similarly, the district court's reliance on Buckley was misplaced. The issue there was whether the Federal Aid in Sport Fish Restoration Act and its interpretive regulations created an enforceable federal statutory right under section 1983. See Buckley, 66 F.3d at 189-90. The court, after analyzing the relevant statutory and regulatory language, held that it did. See id. at 193. Inasmuch as the court stated expressly that it was determining whether the federal statute and its implementing regulations conferred a section 1983 right and not whether such a right arose under the implementing regulations alone, Buckley is distinguishable. See also Powell, 189 F.3d at 401; Farley v. Philadelphia Hous. Auth., 102 F.3d 697, 699 (3d Cir. 1996) ("[The] cause of action arises strictly under[the statutory provision.] Regulation S 966.57(b) merely interprets that section."); Doe v. District of Columbia, 93 F.3d 861, 867

_____

9. It cannot be argued plausibly that by holding in Powell that there was a private right of action under Title VI, we necessarily determined that the plaintiffs in Powell had a right enforceable under section 1983. Even if it could be so argued, however, the aspect of the opinion holding that there is a private right of action under Title VI did not survive Sandoval and thus the 1983 claim would not survive either. In any event, the district court in South Camden II did not determine that the plaintiffs had a right enforceable under section 1983 merely because in Powell we had determined that there was a private right of action enforceable under Title VI. Rather, the court in South Camden II made an independent examination of whether a section 1983 action was available, just as we do. Indeed, it hardly could have avoided making that analysis as it cited favorably Santiago v. Hernandez, 53 F. Supp. 2d 264, 268 (E.D.N.Y. 1999), for the point that "[i]t is conceptually possible for plaintiff who is the intended beneficiary of a statute to have a S 1983 action but not a private right of action, or vice versa . . . ."

27

(D.C. Cir. 1996) (analyzing both statute and its accompanying regulations in determining whether enforceable section 1983 right existed); Tony L. v. Childers, 71 F.3d 1182, 1189 (6th Cir. 1995) (same); City of Chicago v. Lindley, 66 F.3d 819, 827 (7th Cir.1995) (same); Martinez v. Wilson, 32 F.3d 1415, 1421 & n.4 (9th Cir. 1994) (same); Howe v. Ellenbecker, 8 F.3d 1258, 1263 (8th Cir. 1993) (same), overruled by Blessing, 520 U.S. at 348, 117 S.Ct. at 1363; Albiston v. Me. Comm'r of Human Servs., 7 F.3d 258, 265 (1st Cir. 1993) (same), overruled by Blessing, 520 U.S. at 348, 117 S.Ct. at 1363; Pinnacle Nursing Home v. Axelrod, 928 F.2d 1306, 1313–14 (2d Cir. 1991) (same); Samuels v. District of Columbia, 770 F.2d 184, 195 (D.C. Cir. 1985) (same).

There are cases in other circuits addressing the question of whether a regulation alone may create a right enforceable under section 1983. The Courts of Appeals for the Fourth and Eleventh Circuits concluded that they may not and the Court of Appeals for the Sixth Circuit decided to the contrary. In Smith v. Kirk, 821 F.2d 980, 982 (4th Cir. 1987), the court considered whether the state's use of an economic needs test on disabled persons requesting vocational rehabilitation services stated a cause of action under section 1983 for violations of the Social Security Act and its implementing regulations. After concluding that nothing in the statute created an entitlement to vocational rehabilitation services, the court addressed the plaintiff 's argument that the mandatory language utilized in the implementing regulations created such a right. See id. at 984. The court rejected this claim, stating:

> An administrative regulation . . . cannot create an enforceable S 1983 interest not already implicit in the enforcing statute. The Supreme Court has never held that one could--to the contrary, members of the Court have expressed doubt that `administrative regulations alone could create such a right.'

Id. (quoting Wright, 479 U.S. at 437, 107 S.Ct. at 777 (O'Conner, J., dissenting)). Therefore, the court affirmed the district court's dismissal of the plaintiff 's section 1983 cause of action. See id.; see also Former Special Project Employees Ass'n v. City of Norfolk, 909 F.2d 89, 94 (4th

28

Cir. 1990) (following Smith and concluding that "because [the statutory provision] does not provide an enforceable right, the [administrative regulation is] irrelevant to our consideration of the employee's claim under section 1983").

The Court of Appeals for the Eleventh Circuit reached a similar conclusion in Harris v. James, 127 F.3d 993 (11th Cir. 1997). There, the court considered whether a Medicaid regulation requiring states to provide non-emergency transportation to and from providers created a right to such transportation enforceable under section 1983. See id. at 996. The court began by reviewing the Supreme Court's precedent governing whether violations of federal statutes create section 1983 causes of action. See id. at 997–1005. Then, the court turned to the specific question of whether the regulation created a federal right. See id. at 1005. There, like here, the requirement plaintiffs sought to enforce "appear[ed] explicitly not in the Medicaid Act, but in a federal regulation," with the plaintiffs claiming that "the regulatory and statutory provisions create[d] a federal right to transportation to and from providers." Id. The court rejected this argument. See id. at 1009–10.

In doing so, it first acknowledged the relative dearth of authority on this precise issue, noting that courts of appeals are split and that the Supreme Court never definitively addressed the matter. See id. at 1005–07 (citing Wright, 479 U.S. at 437–38, 107 S.Ct. at 777–78 (O'Conner, J., dissenting); Guardians Ass'n, 463 U.S. at 638, 103 S.Ct. at 3251; Loschiavo v. City of Dearborn, 33 F.3d 548, 551 (6th Cir. 1994); Smith, 821 F.2d at 984). The court then analyzed the majority opinion in Wright to ascertain whether it rejected the dissent's view of cases involving federal regulations, namely that administrative regulations alone cannot create enforceable federal rights, and found that it did not. See Harris v. James, 127 F.3d at 1007–08 ("We conclude that the Wright majority did not hold that federal rights are created either by regulations`alone' or by any valid administrative interpretation of a statute creating some enforceable right."). Therefore, the court rejected the argument that a " `federal right' [may be found] in any regulation that in its own right meets the three-prong `federal rights' test," as well as the argument that

29

"enforceable rights [may be found] in any valid administrative interpretation of a statute that creates some enforceable right." Id. at 1008. Instead, it adopted the rule that:

> [S]o long as the statute itself confers a specific right upon the plaintiff, and a valid regulation merely further defines or fleshes out the content of that right, then the statute--`in conjunction with the regulation'--may create a federal right as further defined by the regulation.
>
> . . .
>
> [But], if the regulation defines the content of a statutory provision that creates no federal right under the three-prong test, or if the regulation goes beyond explicating the specific content of the statutory provision and imposes distinct obligations in order to further the broad objectives underlying the statutory provision, we think the regulation is too far removed from Congressional intent to constitute a `federal right' enforceable under S 1983. To hold otherwise would be inconsistent with the driving force of the Supreme Court precedent requiring a Congressional intent to create federal rights and with the Supreme Court's directive that courts must find that Congress has unambiguously conferred federal rights on the plaintiff.

Id. at 1009 (footnotes omitted).

Applying this rule, the court concluded that the regulation did not define the content of any specific right conferred upon the plaintiffs by statute because the"nexus between the regulation and Congressional intent to create federal rights [was] simply too tenuous to create an enforceable right to transportation." Id. at 1009-10. Finally, the court stated:

> It may be that each of these statutes creates some federal right; similarly, it may be that the transportation regulation is a valid interpretation of each of these provisions under Chevron. However, we do not think these two factors, even if we found both to be true, would add up to a federal right of

transportation. In each case the transportation regulation would be valid not because it reasonably defines the content of rights created by the statutory provisions, as did the regulation in Wright, but only because the regulation furthers the broad objectives underlying each statutory provision. . . . Instead, if the regulation is a valid interpretation of these provisions, it would be because transportation may be a reasonable means of ensuring the prompt provision of assistance, comparable assistance, or choice among providers. Such links to Congressional intent may be sufficient to support the validity of a regulation; however, we think they are too tenuous to support a conclusion that Congress has unambiguously conferred upon Medicaid recipients a federal right to transportation enforceable under S 1983.

Id. at 1011-12 (footnote omitted); see Kissimmee River Valley Sportsman Ass'n v. City of Lakeland, 250 F.3d 1324, 1327 (11th Cir. 2001) (applying Harris and concluding that "even more clearly . . . the instant regulation imposes new and `distinct obligations' not found in the statute itself, and thus is `too far removed from the Congressional intent to constitute a federal right enforceable under S 1983' "), cert. denied, 70 U.S.L.W. 3106 (Nov. 26, 2001) (No. 01-204); Doe v. Chiles, 136 F.3d 709, 717 (11th Cir. 1998) (utilizing Harris analysis and finding federal right was created by statute and regulations that "further define[d] the contours of the statutory right" at issue).

The Court of Appeals for the Sixth Circuit, however, reached the opposite result in Loschiavo. There, the court held that because administrative regulations have the force of law, they may create enforceable rights under section 1983. See Loschiavo, 33 F.3d at 551 (citing Wright, 479 U.S. at 431, 107 S.Ct. at 774). Accordingly, the court concluded that the regulation at issue created a federal right enforceable through section 1983. See id. at 552-53; see also Levin v. Childers, 101 F.3d 44, 47 (6th Cir. 1996) (stating Loschiavo court held "plaintiffs may use Section 1983 to enforce not only constitutional rights, but also

31

those rights defined by federal statutes [and federal regulations]").10

Nevertheless, in light of the foregoing analysis, we reject the Loschiavo approach. To start with, we reiterate that in Sandoval the Court made the critical point that"[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." 532 U.S. at ___, 121 S.Ct. at 1522. Furthermore, as we noted previously, the Court's focus in Wright was on tying Congress' intent to create federal rights through the statute to the particular federal right claimed. See Wright, 479 U.S. at 430, 107 S.Ct. at 774; Harris, 127 F.3d at 1008–09. It was of paramount importance that Congress intended to create such a right in the statute, with the regulation then defining the right that Congress already conferred through the statute. See Wright, 479 U.S. at 430 n.11 & 431, 107 S.Ct. at 774 & n.11; Harris, 127 F.3d at 1008.

Moreover, it is apparent that in the Court's section 1983 jurisprudence after Wright dealing with whether a plaintiff is advancing an enforceable right, the primary consideration has been to determine if Congress intended to create the particular federal right sought to be enforced. See Suter, 503 U.S. at 357, 112 S.Ct. at 1367 (stating issue as "[d]id Congress, in enacting the Adoption Act, unambiguously confer upon the child beneficiaries of the Act a right to enforce the requirement that the State make `reasonable efforts' to prevent a child from being removed from his home, and once removed to reunify the child with his family?"). Inasmuch as the Loschiavo court's approach first did not examine whether Congress intended to create the particular right at issue, we reject its holding that a federal right may be found in any federal regulation that, in its own right, meets the Blessing test.

Therefore, we follow Wright, in accordance with its actual holding, the teaching of Sandoval, and the holdings in Harris and Smith, which we believe the courts of appeals

_____

10. Of course, when the issue was raised in a district court within the Sixth Circuit the court followed Loschiavo. See Lucero v. Detroit Public Sch., 160 F. Supp. 2d 767, 781–85 (E.D. Mich. 2001).

decided correctly, and hold that the EPA's disparate impact regulations cannot create a federal right enforceable through section 1983. To the extent, if any, that Powell might be thought on a superficial reading to suggest otherwise, in the light of Sandoval we cannot regard it as stating controlling law. Since the time of the Supreme Court's decision in Sandoval, it hardly can be argued reasonably that the right alleged to exist in the EPA's regulations, namely to be free of disparate impact discrimination in the administration of programs or activities receiving EPA assistance, can be located in either section 601 or section 602 of Title VI.

In reaching our result, we emphasize the following. Sandoval made it clear that section 601 proscribes intentional discrimination only. See Sandoval , 532 U.S. at ___, 121 S.Ct. at 1516. In discussing whether section 602 and its implementing regulations created an implied right of action, the Court first considered whether Congress intended to create a federal right in favor of the plaintiffs.11 See id. at ___, 121 S.Ct. at 1520 21. After reviewing the relevant language of section 602, the Court stated:

_____

11. To adjudge whether an implied right of action exists under a particular statute, courts employ a four-factor test the Court first articulated in Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088 (1975). As the Court explained in Cannon:

> In determining whether a private remedy is implicit in a statute not
> expressly providing one, several factors are relevant. First, is the
> plaintiff `one of the class for whose especial benefit the statute was
> enacted,' that is, does that statute create a federal right in favor of
> the plaintiff? Second, is there any indication of legislative intent,
> explicit or implicit, either to create such a remedy or to deny one?
> Third, is it consistent with the underlying purpose of the legislative
> scheme to imply such a remedy for the plaintiffs? And finally, is the
> cause of action one traditionally relegated to state law, in an area
> basically the concern of the States, so that it would be inappropriate
> to infer a cause of action based solely on federal law?

Cannon, 441 U.S. at 688 n.9, 99 S.Ct. at 1953 n.9 (quoting Tex. & Pac.

R. Co. v. Rigsby, 241 U.S. 33, 39, 36 S.Ct. 482, 484 (1916)) (citations and emphasis omitted). Although not expressly, the Sandoval Court began, and ended, its analysis with the first factor, namely whether Congress intended to create a right in favor of the plaintiffs. See Sandoval, 532 U.S. at ___, 121 S.Ct. at 1520-21.

33

It is immediately clear that the `rights-creating'
language so critical to the Court's analysis in Cannon
of S 601, is completely absent from S 602. Whereas
S 601 decrees that `[n]o person . . . shall . . . be
subjected to discrimination,' the text of S 602 provides
that `[e]ach Federal department and agency . . . is
authorized and directed to effectuate the provisions of
[S 601].' Far from displaying congressional intent to
create new rights, S 602 limits agencies to
`effectuat[ing]' rights already created byS 601. And the
focus of S 602 is twice removed from the individuals
who will ultimately benefit from Title VI's protection.
Statutes that focus on the person regulated rather
than the individuals protected create `no implication of
an intent to confer rights on a particular class of
persons.' Section 602 is yet a step further removed: it
focuses neither on the individuals protected nor even
on the funding recipients being regulated, but on the
agencies that will do the regulating. . . . So far as we
can tell, this authorizing portion of S 602 reveals no
congressional intent to create a private right of action.

 Nor do the methods that S 602 goes on to provide for
enforcing its authorized regulations manifest an intent
to create a private remedy; if anything, they suggest
the opposite. . . . Whatever these elaborate restrictions
on agency enforcement may imply for the private
enforcement of rights created outside ofS 602, they
tend to contradict a congressional intent to create
privately enforceable rights through S 602.

Id. at ___, 121 S.Ct. at 1521 (citations omitted). Therefore,
the Court found that there was no evidence of
congressional intent to create new rights under section 602.
See id. Rather, "S 602 limits agencies to`effectuat[ing]'
rights already created by S 601."12 Id.

_____

12. It is important to note that relying upon the Sandoval Court's
assessment of Congress' intent in enacting section 602, set forth in the
context of determining whether there is a private right of action for the
purposes of determining whether an enforceable right exists, does not, as
the district court found, conflate the distinction between rights and
remedies. See South Camden II, 145 F. Supp. 2d at 517 ("The essence of

34

Inasmuch as the Court found previously that the only
right conferred by section 601 was to be free of intentional
discrimination, it does not follow that the right to be free
from disparate impact discrimination can be located in
section 602. In fact, it cannot. In sum, the regulations,
though assumedly valid, are not based on any federal right
present in the statute. Thus, this case is very similar to
Smith and Harris. Here, as there, the regulations do more
than define or flesh out the content of a specific right
conferred upon the plaintiffs by Title VI. Instead, the
regulations implement Title VI to give the statute a scope
beyond that Congress contemplated, as Title VI does not
establish a right to be free of disparate impact
discrimination. Thus, the regulations are "too far removed
from Congressional intent to constitute a `federal right'
enforceable under S 1983." Harris, 127 F.3d at 1009.

Accordingly, if there is to be a private enforceable right
under Title VI to be free from disparate impact
discrimination, Congress, and not an administrative agency
or a court, must create this right. In this regard, we point
out what should be obvious: the scope of conduct subject
to being interdicted by limitations on actions having a
disparate impact is far broader than limitations on
intentional discrimination. Thus, we reiterate that if Title VI

_____

the NJDEP's and [St. Lawrence]'s misunderstanding of Sandoval lies in
their conflation of rights with remedies in their analysis of the Supreme
Court's holding in Sandoval."). It is true, as the district court
repeatedly
stated, that "[t]he holding in Sandoval  is explicitly limited to the
determination that S 602 itself does not create a right of private
action,"
or in other words, a remedy. Id. at 518. It is also true, as the Sandoval
Court stated and the district court emphasized, that this court is "bound
by holdings, not language." Sandoval, 532 U.S. at ___, 121 S.Ct. at 1517.
That being said, we are not precluded from utilizing the Court's
discussion of Congress' intent in enacting Title VI, although raised in
the
context of whether Congress intended a remedy  through section 602
directly, to help it discern whether Congress intended to create a right
that is enforceable through section 1983. Doing so respects the
difference between the Cort implied-right-of-action analysis and the
Blessing "rights" analysis because it relies upon the factor common to
both.

is to go so far as to have the application that plaintiffs wish, Congress should take it there.

We emphasize that the implications of this case are enormous and obviously, as the appearance of the many amici curiae attests, have not been lost on interested parties. It is plain that in view of the pervasiveness of state and local licensing provisions and the likely applicability of Title VI to the agencies involved, the district court's opinion has the potential, if followed elsewhere, to subject vast aspects of commercial activities to disparate impact analyses by the relevant agencies. Indeed, we noted in Powell that "[a]t least 40 federal agencies have adopted regulations that prohibit disparate-impact discrimination pursuant to [section 602]." Powell, 189 F.3d at 393. While we do not express an opinion on whether that would be desirable, we do suggest that if it is to happen, then Congress and not a court should say so as a court's authority is to interpret rather than to make the law.13

IV. CONCLUSION

We sum up our conclusions as follows. The Supreme Court's primary concern in considering enforceability of federal claims under section 1983 has been to ensure that Congress intended to create the federal right being advanced. See Suter, 503 U.S. at 357, 112 S.Ct. at 1367; Wright, 479 U.S. at 431, 107 S.Ct. at 774. Accordingly, we hold that a federal regulation alone may not create a right

_____

13. St. Lawrence and NJDEP raise numerous other procedural and substantive arguments in support of their appeals. In view of our result, with one exception, we do not address them as the appeal is only from the granting of preliminary injunction that we are reversing on other grounds. Nevertheless, it is possible that on further proceedings the issues involved in those arguments may be significant and thus we want to make it clear that we are taking no position on those points. The one exception is NJDEP's argument that the Eleventh Amendment bars this action to the extent that it "prohibits the retrospective revocation of [St. Lawrence's] air permit." Br. at 44. We are constrained to consider this argument as it is jurisdictional. See Chittister v. Dep't of Cmty. and Econ. Dev., 226 F.3d 223, 227 (3d Cir. 2000). After careful consideration, we have concluded that the argument is without merit, and we therefore reject it without discussion.

enforceable through section 1983 not already found in the enforcing statute. Similarly, we reject the argument that enforceable rights may be found in any valid administrative implementation of a statute that in itself creates some enforceable right. Applying these rules here, it is clear that, particularly in light of Sandoval, Congress did not intend by adoption of Title VI to create a federal right to be free from disparate impact discrimination and that while the EPA's regulations on the point may be valid, they nevertheless do not create rights enforceable under section 1983. The district court erred as a matter of law in concluding otherwise and therefore also erred in finding that plaintiffs are likely to succeed on the merits of their claim. Consequently, we will reverse the district court's order of May 10, 2001, granting preliminary injunctive relief and will remand the case to the district court for further proceedings consistent with this opinion.

37

McKEE, Circuit Judge, dissenting:

Plaintiffs seek to enforce regulations promulgated under S 602 of Title VI of the Civil Rights Act of 1963, 42 U.S.C. S 2000-1. The validity of those regulations is not in dispute here. The regulations are set forth at 40 C.F.R.S 7.10 et seq. and require the defendants to consider the potentially adverse disparate impact of air permits that St. Lawrence needs to operate the proposed facility.[1]

The majority's decision to reverse the district court's grant of preliminary injunctive relief is based upon my colleagues' conclusion that the district court erred "as a matter of law . . . in finding that plaintiffs are likely to succeed on the merits of their claim." Maj. Op. at 37. However, our review here ought to be limited to determining if plaintiffs have established "a reasonable probability of succeeding on the merits. . . ." ACLU v. Reno , 217 F.3d 162, 173 (3d Cir. 2000) (emphasis added). We need look no further than our recent decision in Powell v. Ridge, (3d Cir.) cert denied, 528 U.S. 1046 (1999) to find the answer to that question. The majority correctly notes that the Supreme Court's subsequent decision in Alexander v. Sandoval, 531 U.S. 1049 (2001), overruled part of our holding in Powell. However, Powell was not overruled in its entirety until today. Ironically, the majority overrules Powell by engaging in an analysis that overreads Sandoval while cautioning that "Powell, . . . should not be overread." Maj. Op. at 26. Accordingly, I respectfully dissent from the decision of my colleagues.

I.

Before beginning my discussion I think it is important to define the parameters of our inquiry. First, "we must affirm unless we find the [district] court abused its discretion,

_____

1. The extent to which plaintiffs have already suffered a disparate impact of pollution is readily apparent from the factual summary set forth by the majority. See Maj. Op. at 10 ("As a result, Waterfront South, though only one of 23 Camden neighborhoods, hosts 20% of the city's contaminated sites and, on average, has more than twice the number of facilities with permits to emit air pollution than exist in the area encompassed within a typical New Jersey zip code.").

38

committed an obvious error of law, or made a serious mistake in considering proof." Bill Blass, Ltd v. SAZ Corp, et al, 751 F.2d 152, 154 (3rd Cir. 1984) (emphasis added). Our analysis is not driven by factual issues. Accordingly, our inquiry turns on whether the district court committed an "obvious error of law." If it committed such an error, it abused its discretion in granting preliminary relief. If it did not commit such an error, preliminary relief was appropriate, and we must affirm. Second, there is no issue about the validity of the applicable regulations enacted pursuant to 42 U.S.C. S 602. The majority assumes they are valid, just as the Supreme Court did in Sandoval. Third,

> it has long been the rule in this Circuit that decisions made in similar cases by panels of this Court are binding on other panels . . . . [i]t is only through the Court En Banc that precedents established by earlier [published] panel decisions may be reexamined.

In the Matter of The Central Railroad Co. of New Jersey, 485 F.2d 208, 210 (3rd Cir. 1974). See also Reich v. D.M. Sabia Co., 90 F.3d 854 (3rd Cir. 1996).

The majority concludes that the plaintiffs' action here is "legally insufficient" and that the district court therefore erred in granting preliminary injunctive relief, Maj. Op. at 14, because the disparate impact regulations plaintiffs seek to enforce are "too far removed from Congressional intent to constitute a `federal right' enforceable underS 1983." Id. at 35. Based upon that analysis, the majority concludes that plaintiffs have no reasonable probability of success on the merits and are therefore not entitled to injunctive relief. This analysis not only ignores controlling precedent, it overrules it.

II.

42 U.S.C. S 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the

39

deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress.

Section 601 of Title VI provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. S 2000d. The Supreme Court has held that S 601 only reaches intentional discrimination. See Sandoval, 121 S. Ct. at 1516. However, S 602 authorizes federal regulatory agencies to promulgate regulations under Title VI.

Section 602 provides, in relevant part:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d [Section 601] of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing financial assistance in connection with which the action is taken.

Id. S 2000d-1. The regulations at issue here were promulgated under S 602 and they proscribe discrimination that results from the disparate impact of certain activity. The Environmental Protection Agency is not alone in promulgating disparate-impact regulations underS 602. In Powell we noted that "[a]t least 40 federal agencies have adopted regulations that prohibit disparate-impact discrimination pursuant to this authority." 189 F.3d at 393.

We held in Powell, that the plaintiffs there could maintain an action under S 1983 to enforce disparate impact regulations promulgated under S 602 by the

40

Department of Education that are virtually identical to the regulations promulgated by the Environmental Protection Agency that are at issue here.[2] Plaintiffs in Powell brought an action against state officials challenging the funding mechanism for public education. They alleged, inter alia, that the defendants' method of funding education in the Commonwealth of Pennsylvania had a racially discriminatory impact in violation of Title VI and its implementing regulations.

The district court dismissed the complaint based upon its conclusion that the plaintiffs did not "adequately allege that a specific element of the Commonwealth's funding practices adversely and disproportionately affects students of a particular race." 189 F.3d at 393. On appeal, the defendants asserted an alternative ground for upholding the district court. They argued that the Title VI regulations did not provide an enforceable right. We resolved that inquiry by applying the four prong test established in Cort v. Ash, 422 U.S. 66 (1975), and a similar inquiry set forth in Angelastro v. Prudential–Bache Securities, Inc. 764 F.2d 939 (3d Cir. 1985). See Powell. 189 F.3d at 397 ("It is by now well established that implication of a private right of action for a statute requires analysis of the factors set forth in Cort v. Ash."). We concluded that Title VI afforded plaintiffs a right to enforce the prohibition against disparate impact discrimination contained in the regulations promulgated pursuant to S 602 of Title VI. We stated:

> The regulation at issue here, although promulgated by the Department of Education under 602 of Title VI, implements S 601 of Title VI. The Supreme Court precedent and our cases firmly establish that S 601 of Title VI gives rise to an implied right of action, at least for our purposes for securing injunctive relief.

189 F.3d at 399. We also concluded that the remaining prongs of the relevant inquiry were satisfied and held that

_____

2. The regulation at issue in Powell was codified at 34 C.F.R. S 100.3(b)(2) and it prohibited recipients of applicable federal funds from "utilizing criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, . . . ." 189 F.3d at 393.

41

plaintiffs had therefore established "an implied private right of action to enforce the regulations promulgated under 602 of Title VI." Id. There is no question that that portion of our holding can not stand after the Supreme Court's pronouncement in Sandoval. That was the precise issue addressed in Sandoval and Powell was rendered a dead letter as to that issue. However, that was also the only issue decided in Sandoval. The Court's holding did not address Count II of the complaint that was before the court in Powell.

In Powell, we explained: "[p]laintiffs' second count invokes one of the Civil Rights Acts, 42 U.S.C.S 1983 to address the defendants' alleged violation of the regulation." Id. We concluded that inasmuch as the complaint sought only injunctive and declaratory relief defendants were "persons acting under color of state law" under S 1983. Id. at 401. We then cited Blessing v. Freestone, 520 U.S. 329 (1997) in stating that "once a plaintiff has identified a federal right that has allegedly been violated, there arises a rebuttable presumption that the right is enforceable under S 1983.' " 189 F.3d at 401. Inasmuch as the relevant statute did not explicitly foreclose a suit underS 1983, and since that statute clearly lacked a "comprehensive enforcement scheme that is incompatible with individual enforcement under S 1983," we concluded that plaintiffs could maintain an action to enforce the provisions of the regulations promulgated under S 602 by resorting to S 1983. We stated simply, "we see no reason to hold that resort to S 1983 has been foreclosed here." Id. at 402.

The majority seizes upon that articulation of our holding to minimize the effect of what we said. My colleagues state: "Powell did not analyze the foundation issue that is central here, i.e. whether a regulation in itself can create a right enforceable under section S 1983. In Powell we seemed simply to assume for section 1983 purposes that it could." Maj. Op. at 26–27. My colleagues then cite to Powell at 401 and note that we there stated, "Once a plaintiff has identified a federal right that has allegedly been violated, there arises a `rebuttable presumption that the right is enforceable under S 1983." Maj. Op. 27. I am frankly astounded by that analytical alchemy. The rebuttable

42

presumption we referred to in Powell arises not because we "assumed" a cause of action under S 1983, but precisely because we held there was a cause of action under S 1983. See Blessing, 520 U.S. at 1359. In Blessing , the Court was asked to determine if a plaintiff could enforce a right under S 1983. That was the issue, and it was the only issue. The Court stated, "We granted certiorari to resolve disagreement among the Courts of Appeals as to whether individuals may sue state officials under S 1983 for violations of Title IV–D." Id. at 339–40. The Court began that inquiry by citing Maine v. Thiboutot, 448 U.S. 1 (1980), wherein the Court had held that S 1983 provided a remedy for violations of federal rights, not federal laws. The Blessing Court could not have been clearer in stating: "[i]n order to seek redress through S 1983, however, a plaintiff must assert the violation of a federal right, not merely a violation of federal law." Blessing, 520 U.S. at 340 (emphasis in original). The Court then applied the three factor test set forth in Wright v. Roanoke Redevelopment and Housing Authority, 479 U.S. 418 (1987), to determine if plaintiff had established a federal right. In doing so, the Court noted that if plaintiff had established such a right, it would be enforceable under S 1983 unless Congress had foreclosed resort to S 1983 either in the text of the applicable statute, or the comprehensive nature of the relevant statutory scheme. Blessing, 520 U.S. at 340. It is in this latter context that a presumption arises. Accordingly, there is a presumption that S 1983 is available once a federal right (as opposed to a violation of federal law) is established. The presumption is rebutted if a defendant can establish that Congress expressed its intent (explicitly, or implicitly through the statutory scheme), that the statute not be enforceable under the general rubric of S 1983.

It is true, as the majority notes, that much of our discussion in Powell was worded in terms of refuting defendant's assertion that plaintiffs could maintain a cause of action. The majority notes: that "[Powell ] merely rejected . . . specific arguments. But Powell did not analyze the foundation issue that is central here, i.e. whether a regulation in itself can create a right enforceable under section 1983." Maj. Op. at 26–27. That assertion can not withstand even a cursory reading of Powell. The fact that we "merely rejected" defendant's arguments that S 1983

does not allow a private cause of action to enforce the regulations does not negate the fact that the result of refuting those arguments was that we found plaintiffs had a cause of action under S 1983, and that was part of our holding. The majority's attempt to suggest the contrary is tantamount to arguing that "merely rejecting" the argument that 2 plus 2 does not equal 4 does not at the same time establish that 2 plus 2 does equal 4.

The sleight of hand that transforms our mention of a "presumption" in Powell into an assumption about the application of S 1983 is even more puzzling when one considers that the majority's own analysis states that the relevant presumption does not arise unless the plaintiff can establish a federal right has been violated. My colleagues quite correctly state: "If a plaintiff . . . establishes and identifies a federal right that allegedly has been violated, a rebuttable presumption that the right is enforceable through section 1983 arises." Maj. Op. at 18 (citing Blessing). Therefore, the majority clearly recognizes that Powell concluded that the plaintiffs there had a federal right, arising from the regulations promulgated under Title VI, and that the right could be enforced under S 1983 absent a demonstration that the cause of action was precluded by the text of Title VI, or the statutory scheme. We held that the defendants in Powell could not rebut the presumption. Moreover, the majority here correctly concedes that that was part of our holding in Powell, even while attempting to transform the holding into a mere assumption. See Maj. Op. at 13 ("In reaching its result the [district] court relied, inter alia on Powell v. Ridge, in which we held that there was a private right of action available to enforce a regulation implementing Title VI and that a disparate impact discrimination claim could be maintained under section 1983 for a violation of a regulation promulgated pursuant to section 602.") (emphasis added); see also Maj. Op. at 26 ("We answered both questions in the affirmative, stating that section 602 and the Department of Education regulation at issue provided a private right of action, and that plaintiffs could utilize section 1983 to redress defendant's alleged violation of the statute and regulation.") (emphasis added). As noted above, it is clear that the first part of our holding in Powell does

44

not survive Sandoval. However, that is simply not true of the second part of the holding. Sandoval never discussed the S 1983 issue.

In Sandoval, plaintiffs brought a class action against the Alabama Department of Public Safety in an attempt to enjoin the Department from administering drivers license examinations only in English. Plaintiffs alleged that administering the test in English to Spanish speaking residents had the effect of discriminating against them in violation of S 601 of Title VI. The Court began its analysis by stating that it was clear from the Court's own decisions, Congress' amendments to Title VI, "and from the parties' concessions that three aspects of Title VI must be taken as given." 121 Sup. Ct. at 1516. These were that private individuals could sue to enforce the prohibition of intentional discrimination contained in S 601, that S 601 prohibits only intentional discrimination, and "we must assume for purposes of deciding this case that regulations promulgated under S 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible underS 601." Id. at 1516–17.

In writing for the majority and noting these three principles were taken as given, Justice Scalia observed that five justices of the Court had previously, in Guardians Association v. Civil Serv. Comm'n of New York City , 463 U.S. 582 (1983), voiced that latter principle "at least as alternative grounds for their decisions." Sandoval 121 S.Ct at 1517. Justice Scalia noted that that position was"in considerable tension with the rule of Bakke3 and Guardians that S 601 forbids only intentional discrimination. . . ." Id. However, inasmuch as the plaintiffs in Sandoval had not challenged the regulations and had asserted a claim only under S 601, the Court, "for the purposes of deciding this case" assumed that the regulations proscribing disparate impact discrimination "are valid." Id. at 1517.

The question before the Court was, therefore, a very narrow one. The only issue was whether S 602 created a free standing private cause of action to enforce regulations

_____

3. Referring to Regents of Univ. of Cal. v. Bakke, 438 U.S. 265 (1978).

precluding disparate impact discrimination. As noted above, that was the only question that the Court granted certiorari to review. The Court answered that narrow inquiry as follows:

> "neither as originally enacted nor as later amended does Title VI display an intent to create a freestanding proper right of action to enforce regulations promulgated under S 602. We therefore hold that no such right of action exists."

121 Sup. Ct. at 1523.

The majority seizes upon the "language of Sandoval," to answer the very different inquiry posed by the district court's injunction here. The majority does so even while noting that the Court in Sandoval cautioned that "this Court is `bound by holdings, not language.' " Maj. Op. at 35 n. 12 (quoting Sandoval 121 Sup. Ct. at 1517). The language of Sandoval, however, can not read an issue into that case that was not raised by the parties and not decided by the Court.

The issue here, simply stated, is whether S 1983 provides an independent avenue to enforce disparate impact regulations promulgated under S 602 of Title VI. That is the same question that was posed in Powell. We answered it in the affirmative in Powell, and the answer was not overturned by the subsequent holding in Sandoval. Powell therefore controls our inquiry here until overruled by the Supreme Court, or this court sitting en banc. See Central Railroad, 485 F.2d at 210. Clearly, the majority's decision is not based on any determination of the en banc court. Just as clearly, it is not based upon the holding in Sandoval, or Powell.

The majority reasons that inasmuch as the Sandoval majority did not find the requisite Congressional intent for a private cause of action in the statute there can be no enforceable right under S 1983. See Maj. Op. at 37 ("Applying these rules here, it is clear that, particularly in light of Sandoval, Congress did not intend by adoption of Title VI to create a federal right to be free from disparate impact discrimination and that while the EPA's regulations

46

on the point may be valid, they nevertheless do not create rights enforceable under section 1983.").

However,

> This [an enforceable right under S 1983] is a different inquiry than that involved in determining whether a private right of action can be implied in a particular statute. In right of action cases we employ the four-factor Cort test to determine whether Congress intended to create the private remedy asserted for the violation of statutory rights. The test reflects a concern, grounded in separation of powers, that Congress rather than the courts controls the availability of remedies for violations of statutes. Because S 1983 provides an alternative source of express congressional authorization of private suits, these separation-of-powers concerns are not present in a S 1983 case. Consistent with this view, we recognize an exception to the general rule that S 1983 provides a remedy for violation of federal statutory rights only when Congress has affirmatively withdrawn the remedy.

Wilder v. Virginia Hospital Assoc., 496 U.S. at 508 n.9 (1990) (emphasis added) (internal citations and internal quotation marks omitted) (citing Sea Clammers , 453 U.S. at 19.).

The majority in Sandoval did, in fact, apply the aforementioned Cort test for determining if a cause of action existed in the statute. The Court did not apply the Blessing test that is used under S 1983 analysis.4 This fact alone should cause my colleagues pause before "overreading" Sandoval.

Moreover, if we are to discount Powell on the grounds that Powell only assumed plaintiffs there had an actionable S 1983 claim so too we must distinguish Sandoval—a case

_____

4. Blessing requires, as its first element, that "Congress must have intended that the provision in question benefit the plaintiff." Blessing, 520 U.S. at 340. The Sandoval Court, on the other hand, asked in its private right of action inquiry, "whether it[section 602] displays an intent to create not just a private right but also a private remedy." Sandoval, 121 S.Ct. at 1519.

47

which is even one step more removed than Powell  from the appropriate inquiry--as Sandoval did not even address S 1983 to begin with.

Although my colleagues recognize in a footnote that the four justices who dissented in Sandoval believed that litigants could still bring a S 1983 cause of action for violation of a Title VI disparate-impact regulation, the majority fails to give that fact the significance it deserves. See Maj. Op. at 17 n.5. The dissenting justices responded to the majority's conclusion that the plaintiffs in Sandoval could not bring a cause of action under Title VI by stating:

> to the extent that the majority denies relief to the respondents merely because they neglected to mention 42 U.S.C. S 1983 and framing their Title VI claim, this case is something of a sport. Litigants who in the future wish to enforce the Title VI regulations against state actors in all likelihood must only referenceS 1983 to obtain relief; indeed, the plaintiffs in this case . . . presumably retain the option of rechallenging Alabama's English-only policy in a complaint that invokes S 1983 even after today's decision.

Sandoval at 1527.

In reaching our second holding in Powell, we also noted that

> Defendants' argument conflicts with the Supreme Court's own pronouncements. As previously noted, in Guardians five of the nine justices agreed that the administrative regulations incorporating a disparate impact standard are valid, see 463 U.S. at 584 n. 2, 607 n. 27, 103 S.Ct. 3221, and thereafter the Court in Alexander5 characterized Guardians as so holding. See Alexander, 469 U.S. at 293, 105 S.Ct. 712 ("[Guardians] held that actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI."). Obviously, the Supreme Court did not believe that administrative regulations that prohibit disparate impact were an impermissible

_____

5. Referring to Alexander v. Choate, 469 U.S. 287 (1985).

48

creation of substantive law, even though in its own earlier opinion in Guardians the Supreme Court had held that Title VI itself did not extend that far.

189 F.3d at 399-400.

Moreover, Supreme Court precedent affords additional support for the plaintiffs' claim here. In Wright v. City of Roanoke Redevelopment & Hous. Auth., supra , the plaintiffs brought an action under S 1983 to enforce regulations that defined "rent" under the relevant statute. Defendants argued that the rights plaintiffs sought to enforce under S 1983 were too amorphous and vague to confer an enforceable right under S 1983. In rejecting that argument the Supreme Court proclaimed that "[t]he regulations . . . have the force of law." 479 U.S. at 431.

The majority attempts to distance the instant inquiry from the analysis in Wright by arguing that the Court there first examined the relevant statute and concluded that the statute, itself, conferred the right plaintiffs were seeking to enforce under S 1983. Only upon making that determination, argues the majority, did the Court then conclude that the relevant regulations could properly define and flesh out the statutorily conferred right. The majority then concludes that, inasmuch as the relevant right here resides in the regulations, not Title VI, S 1983 can not independently afford the relief that Congress did not provide for in the controlling statute. Maj. Op. at 24.

It is true that the Court in Wright ordered its analysis as the majority suggests. However, the Court stated that the regulation had the force of law as part of its Blessing analysis. Significantly, the Court applied that analysis not to the provisions of the statute, but to the regulation itself. Accordingly, Wright is consistent with, and supports, the plaintiffs' position here that the regulations themselves may give birth to a federal right so long as the regulations are valid.

In addition, the Supreme Court later interpreted Wright as finding an enforceable right in the interrelationship between the regulations and underlying statute. See Wilder, 496 U.S. at 511 ("[I]n Wright, we found that the [statute] . . . and its implementing regulations did create rights

49

enforceable under S 1983."). Cases that we decided before Powell reached the same conclusion. See Alexander v. Polk, 750 F.2d 250 (3d Cir. 1984)).

In Polk, we concluded that the regulation at issue created an enforceable right. See Polk, 750 F.2d at 259 ("It is clear that 7 C.F.R. S 246.24 created an enforceable right on behalf of [plaintiffs] to be informed of the availability of fair hearings."). The majority attempts to reconcile today's opinion with Polk by stating that the right identified there could be "traced to and was consistent with the statute". Maj. op. at 25. We ought not dismiss Polk so easily however, given our pronouncement in Powell. Although we did not cite Polk in Powell, we were clearly aware of the Polk analysis, and it is consistent with our result in Powell. Furthermore, although Polk was decided before Blessing, it is clear that the analysis in Polk is consistent with a Blessing analysis, and the focus upon congressional intent. See Polk, 750 F.2d at 259 ("The provision was intended to safeguard the legal rights of WIC beneficiaries by informing them of fair hearing procedures.").

The regulations the South Camden plaintiffs are attempting to enforce can also be traced to Title VI. The majority focuses on the fact that S 601 proscribes only intentional discrimination. Nevertheless, disparate-impact regulations may very well reflect an agency's practical considerations and definition of discrimination, just as "rent" was defined by the Department of Housing and Urban Development in the regulations in Wright . We cannot invalidate that regulatory definition without invalidating the regulations, and the majority claims that it is not doing that.6

Lastly, in keeping with the tendency to rely upon "language" that is favorable, and distinguish contrary pronouncements as "dicta," the majority dismisses our decision in West Virginia Univ. Hospitals v. Casey, 885 F.2d 11 (3rd Cir. 1989) as "dicta." Maj. op. at 26. In Casey, we interpreted Wright and Polk as standing for the proposition that regulations, as well as statutes, can create rights that are enforceable under S 1983. There we stated,"valid

_____

6. Although the majority snipes at the disparate-impact regulations, my colleagues concede they are valid for purposes of the instant analysis.

50

federal regulations as well as federal statutes may create rights enforceable under section 1983," and we cited Wright, and Polk. 885 F.2d at 18. I readily concede that Casey involved only a statute, not regulations, and therefore, this statement was "dicta" just as the majority states. However, I think it noteworthy that my colleagues so readily dismiss statements from our own jurisprudence as "dicta" while relying upon dicta from cases that support its analysis and identifying the "dicta" as "teachings." See Maj. Op. at 32–33 ("we follow Wright, in accordance with its actual holding, the teaching of Sandoval, and the holdings in Harris and Smith, which we believe the courts of appeals decided correctly").

Of course, whether or not the plaintiffs would ultimately prevail on the merits is not the issue before us today. However, given controlling precedent in Powell I frankly fail to see how we can conclude that their chances of prevailing are anything less than reasonable. Moreover, their position has been adopted by our sister Court of Appeals for the Sixth Circuit. See Loschiavo v. City of Dearborne, 33 F.3d 548 (6th Cir. 1994), (holding that regulations promulgated under the Cable Communications Policy Act of 1984 created a right which plaintiff could enforce under 42 U.S.C. S 1983, and relying upon Wilder, 496 U.S. at 520 and Wright, 479 U.S. at 432). The reasonableness of the plaintiffs' position is further underscored by the four dissenting justices in Sandoval. They noted:

> the majority declines to accord precedential value to Guardians because the five justices in the majority were arguably divided over the mechanism for which private parties might seek such injunctive relief.

121 Sup. Ct. at 1527.

Conclusion

Accordingly, for the reasons set forth herein, I respectfully dissent from the decision of the majority. I do readily concede that, given the pronouncements in Sandoval, the majority's opinion here has some force. However, the majority's opinion can not withstand scrutiny given Powell, as well as other cases that were not overruled

51

by Sandoval. I believe that the district court was clearly correct in concluding that plaintiffs can demonstrate a "reasonable probability of success" on the merits.7

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

_____

7. Inasmuch as the majority's analysis is limited to the first prong of the
four part test for upholding a preliminary injunction I have not discussed whether plaintiffs have shown that they will be irreparably harmed by the denial of relief, whether granting the preliminary relief will result in even greater harm to the defendants or whether granting preliminary relief will be in the public interest. See Allegheny Energy Inc.
v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999) citing ACLU v. Blackhorse Pike Regional Bd. Of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (en banc)).

52